REVERSE AND RENDER IN PART; AFFIRM IN PART; Opinion filed
January 29 , 2013.



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-08-01657-CV

**HELPING HANDS HOME CARE, INC. D/B/A AT HOME HEALTHCARE; LAURA
DELZELL; AND JOHNNY JAMES GRICE, Appellants/Cross Appellees**

**V.**

**HOME HEALTH OF TARRANT COUNTY, INC. D/B/A
HOME HEALTH SPECIALTIES, Appellee/Cross Appellant**

On Appeal from the 160th Judicial District Court
Dallas County, Texas
Trial Court Cause No. 06-03351-H

# OPINION

Before Justices Moseley, Myers, and Richter[1]
Opinion By Justice Moseley

We withdraw our November 21, 2012 opinion in this case and vacate the Court's judgment

of that date. This is now the opinion of the Court.

Home Health of Tarrant County, Inc. d/b/a/ Home Health Specialties (Specialties) sued

Helping Hands Home Care, Inc. d/b/a At Home Healthcare (Helping Hands), Laura Delzell, and

Johnny James Grice seeking lost profits based on claims of breach of employment contracts, breach

of fiduciary duties, and intentional interference with contracts and future business relations. The

---

[1] The Honorable Martin E. Richter, Retired Justice, sitting by assignment.

alleged damages flow from Specialties's loss of eleven accounts. After suit was filed and before trial, Specialties filed for bankruptcy and, on January 1, 2008, sold its business, except for this lawsuit. The jury found in favor of Specialties and the trial court entered judgment against appellants for $500,000.[2] However, although the jury awarded attorney's fees to Specialties, the trial court granted Helping Hands's motion for judgment notwithstanding the verdict (JNOV) and Specialties did not receive an award for attorney's fees.

On appeal appellants complain, among other things, that the evidence is legally and factually insufficient to support the jury's findings that they breached any duties and that any breach caused Specialties's claimed losses. They also claim there is no basis for awarding damages to Specialties based on evidence of lost profits accruing after Specialties sold its business and, because of the sale, the evidence is legally and factually insufficient to award damages for lost profits after the date of sale. Specialties cross-appealed asserting the trial court erred by granting JNOV and not awarding the attorney's fees found by the jury.

We conclude the evidence is legally and factually sufficient to support the jury's findings that appellants were liable for breach of certain employment contracts and intentional interference with agreements for Specialties to provide medical services to its clients. We also conclude the trial court did not err by awarding damages based on lost accounts up to the time Specialties was sold. However, we conclude the trial court erred by awarding lost profits accruing after the sale. Finally, we conclude the trial court did not err by refusing to award Specialties its attorney's fees. We affirm the trial court's final judgment in part and reverse and render in part.

## I. INTRODUCTION

---

[2] The judgment also awarded pre-judgment interest on the lost profits accruing up to trial, as well as post-judgment interest on the entire award.

–2–

## A. Factual Background

Both Specialties and Helping Hands provided private duty in-home nursing care for seriously ill pediatric patients. In June 2005, Helping Hands hired a former Specialties officer, appellant Johnny James Grice, as its chief operating officer. In February 2006, Helping Hands hired away two more former Specialties employees, Karen Duckworth and appellant Laura Delzell. About one month later, Helping Hands opened a new branch office with twelve patients, eleven of whom were former Specialties clients.

## B. Trial

Specialties sued Helping Hands, Grice, Delzell, and Duckworth for breach of employment-related agreements; breach of fiduciary duty; and intentional interference with employment agreements, contracts, and future business relations with its clients. Specialties alleged the appellants and Duckworth utilized Specialties's confidential information and improperly solicited its nurses and patients, causing the patients to transfer and causing damages of lost profits to Specialties. Specialties also requested attorney's fees.

The jury was charged on breach of employment-related agreements, breach of fiduciary duty, intentional interference with agreements, conspiracy, damages, and attorney's fees. The jury returned findings favorable to Specialties on all these issues, with the exception of one breach of contract issue favorable to Grice. The jury also did not find malice and did not award exemplary damages.

The trial court rendered judgment for Specialties against Delzell, Grice, and Helping Hands jointly and severally for $500,000 in lost profits.[3] The trial court denied appellants' motion for new trial and Specialties's motion for new trial on the attorney's fee issue.[4]

## C.     Appeal

Appellants filed separate briefs:  Delzell filed one, and Helping Hands and Grice filed another.  They generally make the same arguments.

Appellants contend[5] the evidence is legally and factually insufficient to prove both that the appellants improperly solicited Specialties's patients and that the patients' subsequent transfers resulted from improper solicitations.  As a result, they contend: (1) the jury's answers to questions establishing liability cannot stand; (2) there is no evidence of intentional, tortious interference;[6] (3) the evidence is legally and factually insufficient to support the jury's findings concerning the existence—and breach—of a fiduciary duty between Delzell, Duckworth, and Grice on the one hand and Specialties on the other;[7] (4) the trial court erred by admitting testimony from the parents of two patients whose children did not transfer from Specialties to Helping Hands;[8] and (5) the evidence is legally and factually insufficient to support the entire amount of damages found by the jury.[9]  As

---

[3] Duckworth originally was a plaintiff below, and the jury charge submitted issues as to her.  However, the judgment indicates Duckworth "has been discharged in bankruptcy and has been non-suited as to any judgment in this case."  She is not a party to this appeal.

[4] The jury answered the attorney's fee question in Specialties's favor, but the trial court granted Helping Hands's post-verdict motion to disregard the jury's answer.

[5] In Delzell's first issue and in Helping Hands and Grice's first and second issues.  In addition, in Delzell's fifth issue and Helping Hands and Grice's sixth issue they argue reversal of the judgment is required because a liability theory is "invalid."

[6] In Delzell's third issue and in Helping Hands and Grice's fifth issue.

[7] In their fourth issues.

[8] In Delzell's second issue and Helping Hands and Grice's third issue.

[9] In Delzell's sixth and seventh issues and Helping Hands and Grice's seventh and eighth issues.

to the factual sufficiency of the damages, appellants make two arguments: (1) the evidence is insufficient to prove appellants improperly solicited any of the patients who transferred and their transfers would not have occurred but for such solicitations; and (2) the evidence negates the recovery of any lost-profit damages accruing after the January 1, 2008 sale of the business.

Specialties filed a cross-appeal. In two issues, it argues the trial court erred by granting JNOV on the attorney's fees awarded by the jury and by denying its motion to sever and motion for new trial on attorney's fees.

## II. THE RECORD

The record includes the following evidence.

### A.    Specialties's Personnel and Work

Grice testified he worked at Specialties as the chief operating officer. As part of his employment, he signed a "Confidential and Proprietary Information **Agreement" with Specialties's predecessor company.**[10] Grice also had a separate "Employment Termination and Stock Repurchase Agreement" with Specialties that prohibited him from soliciting Specialties's patients to transfer to another agency and from using Specialties's confidential information "in any fashion at any time."

Janice Green was Specialties's administrator and chief clinical officer. Green oversaw Specialties's day-to-day operations in all divisions and departments and the supervisors of the individual programs. One of her responsibilities was the pediatric division; that division had two groups: a pediatric therapy group consisting of about 120 clients, and a private-duty pediatric group consisting of about thirty clients. **The second group was "high acuity," indicating the patients had**

---

[10]Grice's Confidential and Proprietary Information Agreement was admitted as Exhibit 23, which is missing from the record on appeal. However, several such agreements with other Specialties's personnel are in the record, including Delzell's, which was admitted as Exhibit 4. The Confidential and Proprietary Information Agreements in the record are identical in the quoted provision below. There is no evidence or argument that Grice's agreement differed in the quoted provision.

serious health conditions that might require twenty-four-hour care. The second group generated "significantly greater" revenues than the first group.

Green testified Specialties's patient lists included schedules, care plans, billing information, and patient and employee contact information. These lists were proprietary and confidential; they were password-protected on Specialties's computers, and employees signed confidentiality agreements to protect that information from other companies. Green said obtaining a list of those seriously ill patients and their nurses and divulging that information outside the company would violate an employee's confidentiality agreement.

Green testified the parents of pediatric patients relied on an agency to "be in their homes day in and day out to provide services around the clock." She said that these patients had a "particular vulnerability" because staffing was "a huge issue"; the patients and parents became "very attached to the nursing staff" placed in their homes; and parents "rel[ied] heavily on them" care for their children.

Delzell worked at Specialties as a case manager who supervised nurses caring for the thirty pediatric patients in the private-duty group. She oversaw the private-duty pediatric group under Green's supervision. Delzell periodically certified these patients' qualifications for third-party funds (i.e., insurance or other health plan benefits) that allowed them to receive in-home nursing care. Grice said Delzell was "unique" because of "her relationship with her patients and the employees"; Delzell worked hard for her patients, knew how to obtain certifications for the services they needed, and "went way above and beyond the normal call of duty to take care of these patients." Delzell also was responsible for "quality control," which included informing patients in her department of the proper channels to make complaints, receiving any complaints from patients and writing them up on a formal complaint procedure, and discussing the resolution of those complaints with Green.

Green testified she had no written complaints on file from the patients who transferred after appellants left Specialties.

Duckworth also worked at Specialties, scheduling the nurses who provided the care.

Specialties's personnel, including Grice, Delzell, and Duckworth, signed agreements acknowledging the client lists (including insurance and health information) constituted confidential and proprietary information. They agreed to not use confidential and proprietary information that had not been authorized and to not solicit Specialties's patients on behalf of another agency. The evidence included a "Confidential and Proprietary Information Agreement." In that agreement, Delzell agreed she

> will hold in strictest confidence, and will at no time, either during discussions with the Company during or after termination, use for himself/herself or others, or disclose to others, directly or indirectly, any Confidential or Proprietary Information, except as such disclosure or use is expressly authorized by the Company. You [i.e., Delzell] agree that you will not solicit or direct any client to hire you independently for their care or transfer their care with you to another agency.

## B.     Specialties's Personnel Move to Helping Hands

Grice left Specialties in June 2005, and joined Helping Hands as chief operating officer. In January 2006, Delzell told Green she planned to leave Specialties; she left on February 24, 2006. Green testified Delzell agreed not to contact Specialties's employees or patients, and Delzell told Green she was "more ethical than that." Delzell wrote a letter informing the staff of her decision to leave and the date of her departure; she did not include the name of her new employer or any information about her new job. There was conflicting testimony about whether Green saw the letter before it was sent to the nurses. Green testified that upon leaving Specialties, Delzell did not return any patient or nursing call lists to Green.

Delzell and Duckworth joined Helping Hands where they were responsible for opening a new Helping Hands branch office in Rockwall. On April 1, 2006, that office opened with twelve patients, eleven of whom who had transferred from Specialties. All the Helping Hands patients who transferred from Specialties as of April 1 had been in the high-revenue group Delzell previously supervised.

Green testified some other patients and employees left Specialties after Delzell did, but that they "did not go to one specific agency and start working on the same day." Duckworth testified by deposition that she spoke to Specialties's employees after going to work at Helping Hands "to tell them where we were." But she said they contacted her, she did not contact them.

Green also testified concerning procedures between agencies when a patient transferred from one agency to another. In each patient's home, Specialties maintained a "home chart" where nurses documented home health care. Regulations provided that an agency accepting a transferring patient must send an "elective beneficiary transfer form" to the old agency indicating the new agency would be taking over the patient's care. The transfer notice allowed the old agency to complete a discharge summary of information in the patient's home and pick up any information that belonged to Specialties. Green testified Helping Hands never sent the forms for the eleven transferring patients to Specialties. She also said discharge summaries were not prepared for these eleven patients because they called Specialties the day of transfer and "said don't come back."

Green admitted on cross examination that she never contacted any transferring patients or parents before Specialties filed suit on April 6, 2006. Green also agreed a patient could choose an agency, and the patient's admission agreement stated either party could terminate the agreement at any time. She said some nurses continued to work at Specialties after they began working at Helping

Hands. However, full-time employment status at Specialties precluded part-time employment at another agency.

The record contains an "Agency to Agency Transfer" for each of the eleven former Specialties patients, signed by the patients' parents and stating they selected Helping Hands for skilled nursing effective April 1, 2006, "free of any undue pressure, solicitation, or coercion by any employee of [Helping Hands]" and that they each "believe[d] that our family will be better served by [Helping Hands]."

## C.    Testimony at Trial

The jury heard testimony from nurses, parents of children who were treated by Specialties, Specialties's employees, and Helping Hands's employees.

### 1. Magers's Testimony

Allison Magers was a Specialties nurse; her patient was one of the eleven patients who transferred to Helping Hands. She testified Delzell told her she was leaving Specialties and wanted Magers to work at Delzell's new employer and pick up patients there. Magers did not recall if Delzell used the name of the company. During another conversation, Delzell told Magers she could apply on the website and Magers asked for the name of the site. Magers then applied. Magers had a high regard for Delzell and "wanted to keep up with her" because of professional rapport. Magers testified Delzell offered her more vacation days and better insurance to work at Helping Hands and these benefits played a part in Magers's decision to go to work there. Magers also testified she had no personal knowledge of Delzell "trying to persuade other people" at Specialties to work at Helping Hands. But she testified Delzell and Duckworth "were trying to get us to go and they did ask if we could talk to our patients and let them know what our decision was going to be, you know, but they did not say tell them – they did not say tell to come to [Helping Hands]."

On cross examination, Magers agreed she learned Delzell was leaving Specialties when she saw Delzell's departure letter on Delzell's desk. She agreed she initiated a conversation with Delzell because she was unhappy with changes to Specialties's pay policy. Magers knew other Specialties's employees were also unhappy with the changes. Magers told Delzell she wanted to follow Delzell to her new employer. On redirect examination, however, Magers reiterated that during their conversation Delzell invited her to Helping Hands. On recross examination, Magers testified that although new hires at Helping Hands waited ninety days for health benefits, employees who left Specialties for Helping Hands could obtain medical insurance immediately. Grice contradicted Magers's testimony regarding a "special deal on health insurance"; he testified insurance decisions were made by the insurance carrier, not by Helping Hands.

Magers testified she worked at Helping Hands full-time because her Specialties patient, A.R., switched to Helping Hands "at that time as well"; Magers was very close to A.R. and "fairly close" to A.R.'s mother, Angel J. But Magers also testified she told Angel she was working at Helping Hands, and Angel wanted to go where Magers would be working, so Angel transferred A.R. to Helping Hands. Magers was present with Angel when Delzell went to Angel's house to complete the admission paperwork transferring A.R. from Specialties to Helping Hands. Angel signed an "Agency to Agency Transfer" on March 31, 2006. Magers testified Delzell did not explain to her or to Angel what "direct or indirect solicitation" meant.

Magers subsequently left Helping Hands and returned to Specialties; there was conflicting evidence as to why. Magers testified she applied to return to Specialties because A.R. had been hospitalized and Magers was not getting the hours she needed "to make [her] ends meet." Specialties had a full-time case, so Magers took it. Magers also testified Delzell told her she should not return to Specialties because "they're filing bankruptcy."

At trial, Magers testified that after her deposition, she talked to Duckworth who said "you did a good job, we think y'all did a good job on your deposition." When asked what Magers thought Duckworth meant, she replied: "Personally, I feel like, because she knew I had left certain details out about her taking the list, things like that, she knew I didn't tell about that at the [deposition]." Magers testified that she later Magers signed an affidavit about the information she omitted from her deposition.

Within a week or two of Magers's affidavit, Delzell told her a patient had complained about Magers's "demeanor" at the patient's house and felt like Magers "was on drugs or alcohol while at work." Magers denied the charge. Magers testified the Helping Hands employee handbook provided that an employee must take a drug test within twenty-four hours upon request by Helping Hands, but Delzell told Magers to take the test by 5:00 p.m. that day, within three hours of the conversation. Magers could not take the test by 5:00 p.m. due to previously scheduled personal appointments. At 5:00 p.m., Delzell told her she was terminated. Magers testified Delzell did not give her twenty-four hours for the test because Magers (by her affidavit) "added to [her] deposition and mentioned things" that Delzell might "think would hurt her case."[11]

Delzell denied retaliating against Magers because of her affidavit concerning omissions in her deposition.

At trial, Magers also testified that Duckworth told Magers she "was going to use a list of patients' names that she got from [Specialties] and start calling some patients and get some patients at [Helping Hands]." **Duckworth and Delzell were working from Delzell's home until they established the new office.**

---

[11]Grice disputed Magers's testimony that she was entitled to a twenty-four-hour notice period for reasonable-cause drug testing at Helping Hands. He said the twenty-four hour period for drug testing applied to applicants, who were required to take a drug test within twenty-four hours of employment, and to random drug tests of employees, who were required to take a drug test within a twenty-four hour period.

## 2. Moodley's Testimony

Sylvia Moodley, a Specialties nurse, testified at trial that after Duckworth left Specialties, Duckworth called Moodley at the home of her patient, A.D. Duckworth called to talk to A.D.'s mother, but spoke to Moodley instead. Moodley testified about her conversation with Duckworth as follows:

> She told me that she was contacting all Home Health Specialties' patients to give them their name and the name of the company they are with and their phone number, since they don't have an office yet and they were working out of Laura Delzell's home, and she wanted them to have a phone number so they can contact them to change agencies for their – whoever the patient is.

Subsequently, Moodley testified that Duckworth "did tell me that she was contacting everybody, the employees and their patients that were with Home Health Specialties" and that Duckworth was "calling them to tell them the name of the new agency and if they were willing to go to the new agency."

A.D. did not transfer to Helping Hands and, although Moodley applied at Helping Hands, she did not go to work there. There was conflicting testimony whether Moodley sought a pay rate higher at Helping Hands because she told them she could "bring a patient with a lot of revenue."

## 3. Ayala's Testimony

Zandra Ayala, a Specialties nurse, testified she received calls from either Duckworth or Delzell (she talked to both of them but did not remember who called her first) after they left Specialties. They told her if she wanted to work at Helping Hands with them, she should just let them know. Ayala denied they "enticed" or "encouraged" her to transfer. Ayala did not go to work at Helping Hands and there is no evidence Ayala's patient left Specialties for Helping Hands.

## 4. Michelle B.'s Testimony

–12–

Michelle B., a parent of one of Specialties's patients, testified by deposition that Duckworth called her from Delzell's house to invite her to transfer to Helping Hands. Specifically, Duckworth told Michelle B. that she was "just calling to let [Michelle B.] know that they were opening and we could come over there, . . . ." Michelle B. also testified her Specialties nurse "told me that she was asked to ask me when we were coming over to the agency by Laura [Delzell]." Michelle B. did not transfer her child to Helping Hands.

### 5. Lydia R.'s Testimony

Lydia R., whose daughter was a Specialties patient, testified by deposition. She testified Duckworth and Delzell told her they were leaving the company but they did not talk to her about "letting [Helping Hands] or their agency provide care" for her child. But she said she thought they talked to her daughter's nurses because "they [that is, the nurses] would ask me if I wanted, if I was leaving with them . . . ." About six or seven months after Delzell left Specialties, Lydia R. asked Delzell about transferring to Helping Hands.

On cross-examination, Lydia R. answered "no" when asked: "[N]either Karen Duckworth nor Laura Delzell ever called you or contacted you and tried to persuade you to leave [Specialties] and transfer your child's care to the agency that they went to, did they?"

### 6. Hooper's Testimony

Specialties's CEO Kyle Hooper testified he was first notified that patients and nurses were transferring about March 28, 2006. On March 22 or 23, 2006, Delzell called him and told him she heard Specialties's patients and employees were not happy and wanted to transfer, and she wanted to let Hooper know that. (Hooper said he was not aware of any complaints about child care filed through Specialties's complaint procedure.) Hooper reminded Delzell she could not solicit, and she said she would not be that unethical. Early in the conversation, Delzell told Hooper that the parents

−13−

of four patients had called her that day; later, she said the number was three. She said they had her home phone number. Delzell would not give Hooper their names. Hooper's memorandum of this conversation was admitted as an exhibit. Several days later, Hooper attempted to call Grice, but his call was not returned.

Hooper agreed that, in his experience in the industry and at his own company, he had never encountered a block of patients transferring "like this" absent "something like a going out of business or a solicitation . . . ." He said that, although he had no direct knowledge of any solicitation, he said patients were solicited because certain patients "left on one day," "[t]hey were our patients on March 31st and over that two day period they were all gone and they were [Helping Hands' patients]," and "all of the nurses that were involved left at one time with the patients." Hooper said a patient will "occasionally" transfer, for example, if there is a staffing difficulty, but transfer is "infrequent" and "happens over time" not "eleven in one day" to one agency. Also, these transfers were unusual in that the attending nurses also left.

### 7. Delzell's Testimony

Delzell testified she first considered leaving Specialties in October 2005. Delzell denied initially contacting any patient or nurse and asking or encouraging them to come to Helping Hands. During her testimony, Delzell was asked about her deposition. Specifically, she was asked about deposition testimony in which she was asked what she thought she was agreeing to when she agreed with Hooper and Green "not to solicit their patients." She replied, "I was agreeing that I would not call any of their patients and ask them to come with us to the new company." When asked "[w]hat about contacting the nurses who worked with those patients or cared for those patients and try to get them to come to your company in the hopes that the patients would follow?" she replied, "I did not contact the nurses."

–14–

Delzell said some nurses talked to her about prospective future employment, and she referred a few of them to the Helping Hands website. Delzell testified that at a going-away dinner on February 24, 2006, she responded to a request from Leela Thomas, the woman who replaced Delzell at Specialties, for information about Delzell's new employment, but she denied encouraging Thomas to leave Specialties.

She also said three or four parents called her about her departure. After she left Specialties, other parents contacted her about problems they were having at Specialties and their desire to follow Delzell. Delzell denied taking a patient list with her and never saw a list with Duckworth. Delzell said she could not have printed such a list because her computer password was taken away when she tendered her resignation.

Delzell said Grice and other Helping Hands personnel told her not to discuss any Helping Hands details with Specialties nurses and patients and to let another Helping Hands branch handle "intake." She also testified that referrals contacted the central office, which reviewed the information and then sent the prospective client to the billing office to verify insurance benefits. The referral then reached her as a branch manager to determine staffing needs.

Referring to the eleven transfer patients, Delzell was asked whether she had "concerns" about any of them. She said she had concerns about A.R. (Magers's patient). When Delzell and Duckworth interviewed A.R.'s mother, Angel, for Helping Hands, Delzell was concerned that Magers, who was present, "was trying to encourage [Angel] to leave [Specialties]." Delzell told Angel, "I want you to know that this has got to be your decision not the nurse's decision, and you have the right to go anywhere you want to go."

**8. Grice's Testimony about Delzell**

Grice testified Delzell called him about working at Helping Hands. He denied contacting Delzell and encouraging her to work at Helping Hands. He eventually hired her and told her she would have to start the Rockwall office "from scratch." Grice testified he told Delzell "not to do anything to entice or encourage patients or nurses to leave [Specialties] and come to [Helping Hands]," and "not to contact any patients or nurses period." He said she would have violated his instructions if she made the initial contact. He agreed that because of Delzell's "relationship with the patients and nurses at [Specialties] that they could be subject to influence if she contacted them[.]" He knew patients were transferring during March 2006.

## 9. Green's Conversation with Grice about Transfers

Green testified Grice called her at the end of March after Specialties sent out notices about the suit. Green told Grice that Specialties had received no notifications of patients transferring because Helping Hands failed to follow the procedure of providing Specialties with such notifications (consisting of an elective transfer form signed by the patients), nor had Specialties received any discharge notifications "due to transfer" from a physician. Grice told her "he wasn't aware of that." He told Green that "he informed Laura [Delzell] to keep everything on the up and up," suggesting to Green that Delzell was responsible. Green talked to him about patients being solicited and transferring to Helping Hands, and Grice "said that he wasn't aware of any solicitation, that the patients wanted to transfer or follow their nurses." He said he understood "that's what they were doing was following the nurses." Green was asked whether Grice said that "he knew about what kind of contacts Laura [Delzell] had been making." Green replied that the only statement Grice made about contacts was that "he was going to look into or investigate whether or not contacts were made prior to any of the employees completing on-line applications."

Grice also told Green he removed Delzell from hiring new employees at Helping Hands, but Green learned later from looking at records that Delzell continued hiring new employees. Grice also told Green that Helping Hands was getting "plenty of referrals" and did not need Specialties's patients. However, Green noted the statement was not true based on the evidence showing Helping Hands had twelve patients when it opened the office, eleven of whom had been Specialties's patients.

### 10. Grice's Testimony about Transfers

After Grice spoke to Green, as detailed above, he asked Delzell if she "was doing anything to persuade patients or nurses to transfer their services" from Specialties, and she "assured [him] she was not." He also asked the administrator of the pediatric program "if anything inappropriate [was] happening," and she told him he had nothing to worry about. He also hired trial counsel to investigate whether anything improper occurred. He admitted he had not talked to Specialties's parents (specifically, Michelle B. and Lydia R.) and nurses (specifically, Magers and Moodley, as well as nurses Zeke Stewart and Adelaida Castulo); but he disagreed that his investigation was "one-sided." Grice said he told Green that he was going to stop taking applications from Specialties's nurses and patients until he could conduct an investigation.

Grice testified it would be a violation of his instructions not to contact patients and nurses if Duckworth and Delzell made "first contacts." He also agreed "[m]aking first contacts would be something that would raise a suspicion of trying to influence a patient or an employee." He testified he was unaware of any first contacts by Helping Hands personnel. He also agreed eleven patients transferring to a newly opened office in a thirty-day period was not "normal" and was "unusual and different." He agreed that at the end of March 2006, he knew "something unusual was going on."

Grice described the on-line application process at Helping Hands. If a patient or nurse contacted Delzell, she was supposed to direct the applicant to Helping Hands's central intake office and the Human Resources department by way of the website. Grice did not want Delzell involved in the "upfront process," to avoid her influencing anyone in the decision to transfer to Helping Hands. Grice also testified that "solicitation" would have been explained to Delzell and Duckworth during the Helping Hands orientation.

Grice was asked about the "Agency to Agency Transfer" signed by parents or guardians of all eleven transferring patients. He testified he had no indication any person signing the form was being pressured to sign it and it was reasonable for Helping Hands to rely on those documents. He also was asked about required documentation when a transfer occurred. He testified such documentation was a "common practice in most agencies" when a patient transferred from one agency to another, but it was not a "set regulation." Grice testified he did not recall that Specialties, as a receiving agency, submitted a document to "the losing agency" regarding a transfer and requesting the patient's records. Grice also denied an "en masse" transfer of patients took place on one day; he said the first intake or referral occurred on March 10, and patients applied or transferred between that day and March 31. Grice denied he "ratified or endorsed" a scheme to take Specialties's patients and nurses.

## 11. Additional Testimony Regarding Transferring Patients

Several mothers of patients who transferred from Specialties to Helping Hands testified about why they transferred. Their testimony supported appellants' arguments that appellants did not contact Specialties's patients and encourage them to transfer. The testimony included a mother denying that anybody at Helping Hands ever contacted her about leaving Specialties and joining Helping Hands and Delzell did not try to "influence" her "in any way in that decision"; a mother who

said Delzell's care for her child was "[u]nlike anything I was ever used to" and she asked Delzell what she needed to do to follow Delzell; mothers who were unhappy working with Thomas; mothers who had Delzell's telephone number and contacted Delzell after learning Delzell left Specialties; and mothers who testified that Delzell did not pursue them—they pursued her.

Likewise, some Specialties nurses testified and their testimony supported appellants' arguments that appellants did not solicit them. One nurse testified she left Specialties after her paycheck bounced and she was never approached by Delzell about applying to Helping Hands; another nurse stated her patient's mother was "desperate" to leave Specialties because of problems with Thomas.

Delzell also testified about transfers by several patients from Specialties to Helping Hands. Delzell maintained in her testimony that she did not try to persuade or encourage mothers or nurses to leave Specialties and the mothers and nurses pursued her about changing agencies.

## III. SUFFICIENCY OF THE EVIDENCE

### A. Standard of Review

We sustain a legal sufficiency or no-evidence challenge if the record shows: (1) the complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex. 2005). We view the evidence and inferences in the light most favorable to the jury's findings. *See id.* at 823. We must credit evidence that supports the judgment if reasonable jurors could, and we must disregard contrary evidence unless reasonable jurors could not. *See id.* at 827. When reviewing the factual sufficiency of evidence, we examine

all the evidence and set aside a finding only if the evidence supporting the jury finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

When reviewing both the legal and factual sufficiency of the evidence, we are mindful that the jury, as fact finder, was the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819; *Hinkle v. Hinkle*, 223 S.W.3d 773, 782 (Tex. App.—Dallas 2007, no pet.). We may not substitute our judgment for the fact finder's, even if we would reach a different answer on the evidence. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998).

## B.  Jury Findings

The jury found the following:

- Delzell failed to comply with her employment or confidentiality agreement with Specialties.

- Duckworth failed to comply with her employment or confidentiality agreement with Specialties.

- Grice entered into an employment agreement with Specialties, but did not fail to comply with that agreement.

- Grice entered into a confidentiality agreement with Specialties and failed to comply with that agreement.

- Grice entered into an employment termination and stock repurchase agreement with Specialties and failed to comply with that agreement.

- A relationship of trust and confidence existed between Specialties and Delzell, Duckworth, and Grice individually.

- Delzell, Duckworth, and Grice each failed to comply with their fiduciary duties to Specialties.

- Delzell, Duckworth, and Grice each intentionally interfered with employment agreements between Specialties and its employees or Specialties's agreements to provide medical services to its clients.

–20–

- Delzell, Duckworth, and Grice were part of a conspiracy that damaged Specialties.

## C. Discussion: Liability

As noted above, the appellants argue the evidence was insufficient to support the jury's finding of liability on any theory because there was "no evidence of culpability or causation." Specifically, they argue there was no evidence of impermissible solicitation or the solicitation caused the transfers, that is, the transfers would not have occurred but for the solicitation.

However, the jury found the defendants—Delzell, Duckworth, and Grice—were part of a conspiracy that damaged Specialties. The conspiracy question was premised on the jury's affirmative findings that Delzell, Duckworth, or Grice breached at least one agreement with Specialties or tortiously interfered with Specialties's agreements with its employees (i.e., the nurses) or with Specialties's agreements to provide medical services to its clients.[12]

Once a civil conspiracy is proved, each conspirator is responsible for all acts done by any of the conspirators in furtherance of the conspiracy. *Greenberg Traurig of N.Y., P.C. v. Moody*, 161 S.W.3d 56, 90 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (citing *Akin v. Dahl*, 661 S.W.2d 917, 921 (Tex. 1983)). A finding of civil conspiracy further imposes joint and several liability on all conspirators for actual damages resulting from acts in furtherance of the conspiracy. *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925 (Tex. 1979). "[C]ivil conspiracy 'came to be used to extend liability in tort . . . beyond the active wrongdoer to those who have merely planned, assisted, or encouraged his acts.'" *Id.* at 925–26 (citation omitted).

Nowhere in their briefs do the appellants challenge the conspiracy finding. Nor do they challenge the sufficiency of the evidence supporting the affirmative answer to the conspiracy finding.

---

[12]The jury found that Delzell, Duckworth, and Grice each breached at least one agreement with Specialties and that they all tortiously interfered with Specialties's agreements with its employees and its agreements to provide medical services to its clients.

Therefore, because the finding of a conspiracy among appellants remains unchallenged by any appellant, it is binding on the parties and this Court. *See Employers Cas. Co. v. Henager*, 852 S.W.2d 655, 658 (Tex. App.—Dallas 1993, writ denied).

Once the jury found Delzell, Duckworth, and Grice were part of a conspiracy, the effect was to make each of them responsible for any unlawful act committed by either of the others in furtherance of the conspiracy. *See Greenberg Traurig of N.Y., P.C.*, 161 S.W.3d at 90. Consequently, if Delzell, Duckworth, or Grice is liable under any of the contract or tort theories, all are liable. *See id.* Further, the jury's affirmative finding on conspiracy imposes joint and several liability on the individual appellants as joint conspirators for actual damages resulting from their unlawful acts in furtherance of the conspiracy. *See Carroll*, 592 S.W.2d at 925.

Because of the manner in which the jury was charged and appellants' arguments on appeal, our inquiry under appellants' sufficiency of the evidence issues is whether the evidence is sufficient to support the jury's affirmative findings that any one of them—Delzell, Duckworth, or Grice—was liable for breach of contract or tortious interference.

### 1.    Breach of Contract and of Duty not to Interfere

The elements of a breach of contract cause of action are: (a) a valid contract; (b) the plaintiff performed or tendered performance; (c) the defendant breached the contract; and (d) the plaintiff was damaged as a result of that breach. *Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 769 (Tex. App.—Dallas 2005, pet. denied). In this case only the last two elements are in dispute.

To recover for a tortious interference with an existing contract, a plaintiff must prove: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference;

(3) that the act was proximate[13] cause of the plaintiff's damages; and (4) actual damage or loss. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002) (citing *Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 210 (Tex. 1996)). The second, third, and fourth elements are in dispute.

Delzell's confidentiality agreement with Specialties required her to hold "in strictest confidence" and never—during or after termination—use for herself or others or directly or indirectly disclose Specialties's confidential or proprietary information. It also prohibited her from soliciting clients to transfer their care to another agency.

Likewise, in the Employment Termination and Stock Repurchase Agreement, Grice agreed he was prohibited from soliciting Specialties's patients to transfer to another agency and from using Specialties's confidential information "in any fashion at any time." The charge did not define "use of confidential information." We give terms their plain, ordinary, and generally accepted meaning unless the instrument shows the parties used them in a technical or different sense. *See Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). "Use" means "[t]o make use of, to convert to one's service, to avail one's self of, to employ." BLACK'S LAW DICTIONARY 1381 (5th ed. 1979). We conclude the prohibition against using confidential information "in any fashion" includes both the direct and indirect use of that information. Thus, the plain meaning of Grice's prohibition against "use of" Specialties's confidential information "in any fashion at any time" includes availing himself and his employer of Delzell's or Duckworth's use of Specialties's confidential information. Additionally, the jury's finding as to conspiracy made Grice liable for Delzell's or Duckworth's breaches of their employment agreements or their intentional interference with existing contracts.

---

[13] Proximate cause is that cause which in a natural and continuous sequence, unbroken by any new and independent cause, produces the injury and without which the injury would not have occurred. *Phoenix Refining Co. v. Tips*, 81 S.W.2d 60, 61 (Tex. 1935); *Cook Consultants, Inc. v. Larson*, 700 S.W.2d 231, 236 (Tex. App.—Dallas 1985, writ ref'd n.r.e.).

There was evidence Specialties's patient lists included schedules, care plans, billing information, and patient and employee contact information, were proprietary and confidential, and were password-protected on Specialties's computers. Green testified that obtaining a list of patients and their nurses and divulging that information outside the company would violate an employee's confidentiality agreement. Delzell acknowledged the patient lists were confidential. Additionally, Specialties had existing contracts—as documented by the plans of care—to provide medical services to the transferring patients and that solicitation by Delzell, Duckworth, or Grice was prohibited both by their employment agreements with Specialties and, as pertinent to the tort claim, by state regulations.[14]

> The jury charge included the following definition of "solicitation":
>
> Solicitation means a provider agency entices or lures an individual to receive services when it knows that the individual is the client of another provider agency. "Entice" means "to attract artfully or adroitly or by arousing hope or desire." "Lure" means "an inducement to pleasure or gain."

Accordingly, use of confidential information to solicit patients—either directly or indirectly by soliciting their Specialties's nurses—to transfer to Helping Hands constituted both a breach of the no-solicitation and no-use-of-confidential-information promises and an act of interference in Specialties's agreements with its employees and its provision of medical services agreements with its clients.

With respect to the claims against Delzell, there was evidence from both Magers and Moodley that, after Duckworth and Delzell left Specialties, they were working together to contact Specialties's nurses and parents of Specialties's patients to solicit them to transfer to Helping Hands.

---

[14] For example, the Texas Administrative Code section 49.19 regulates advertising and solicitation of clients. It provides: a "provider agency may advertise for clients as long as the provider agency does not: . . . solicit clients from other providers." Tex. Admin. Code § 49.19 (Tex. Dep't of Aging & Disability Servs.).

Specifically, Magers said that, on Duckworth's last day at Specialties, she told Magers she "was going to use a list of patients' names that she got from [Specialties] and start calling some patients and get some patients at [Helping Hands]." And Moodley testified Duckworth told her that "she was contacting all Home Health Specialties' patients to give them their name and the name of the company they are with and their phone number, since they don't have an office yet and they were working out of Laura Delzell's home, and she wanted them to have a phone number so they can contact them to change agencies for their – whoever the patient is." There was evidence Delzell indirectly solicited parents Michelle B. and Lydia R. through their nurses.

Thus, there is some evidence that they solicited the transferring patients and a reasonable jury could have concluded from this evidence and reasonable inferences from it that Delzell and Duckworth, working together, improperly solicited—directly and indirectly—Specialties's patients to transfer to Helping Hands.[15]

Although the jury also heard evidence indicating Delzell and Duckworth did not solicit Specialties's nurses and patients' parents to transfer, the credibility of that evidence was a matter for the jury to resolve. *See City of Keller*, 168 S.W.3d at 819. We conclude the evidence is legally sufficient to support the jury's finding that Delzell and Duckworth failed to comply with their employment or confidentiality agreement with Specialties and intentionally interfered with Specialties's provision-of-medical-services agreements with its clients.[16] *See City of Keller*, 168

---

[15] During the trial, Specialties presented extensive testimony about telephone calls and voluminous exhibits containing telephone records. In its brief, Specialties argues these telephone records "show that the transferring employees were contacted multiple times after Delzel[l] and Duckworth left" Specialties. In their briefs, appellants argue the phone record evidence "is surmise. It is as consistent with innocuous contacts as with anything culpable. And it impermissibly stacks inferences, thus violating all three principles for adjudging the evidentiary value of weak circumstantial evidence." We spent a substantial amount of time reviewing the telephone records, the testimony associated with those records, and the parties' arguments relating to the telephone records. However, based on the findings discussed in this opinion, we need not address whether the phone records show appellants are liable for soliciting Specialties's patients and nurses.

[16] Jury questions 1 and 6.

–25–

S.W.3d at 810, 823, 827; *Hinkle*, 223 S.W.3d at 777-78; *see also Butnaru*, 84 S.W.3d at 207 (setting out elements of intentional interference with existing contract claim); *Case Corp.*, 184 S.W.3d at 769 (setting out elements of breach of contract claim). Further, considering all the evidence, including that detailed above, we conclude the evidence supporting these findings is not so weak as to be clearly wrong and manifestly unjust. *See id.* at 826; *Cain*, 709 S.W.2d at 176.

Because the evidence is legally and factually sufficient to support the jury's findings that Delzell breached employment agreements and intentionally interfered with existing employee and client agreements, we resolve Delzell's first and third issues against her to this extent.

With respect to the claims against Grice, there is evidence Green told Grice that Delzell and Duckworth were "contacting" Specialties's patients and that a number of Specialties's patients had transferred to Helping Hands. He agreed such transfers were "unusual." There is evidence Grice warned Delzell "not to contact any patients or nurses period" but the only actions he took were to ask Delzell and her supervisor about their solicitation of Specialties's patients or nurses (which they denied) and to hire an attorney to investigate. There was some evidence Grice did not ask any of the parents of transferring patients whether they had been solicited and, if so, whether they transferred as a result of such solicitation. There was also some evidence Grice did not question any of the transferring nurses. Delzell and Duckworth had one month between leaving Specialties and opening the new Helping Hands office in which to find patients. Grice told Green that Helping Hands was getting "plenty of referrals" and did not need Specialties's patients, but the evidence does not support that assertion. There was no evidence Grice refused to allow transferring patients to receive care from Helping Hands until he had investigated.

The only argument Grice makes relates to the sufficiency of any evidence of transfers resulting from solicitation *by him*. However, based on this evidence and reasonable inferences, a

–26–

reasonable jury could have concluded Grice made "use of confidential information" by availing himself of Delzell's and Duckworth's improper solicitation of Specialties's patients.[17] Thus, we conclude the evidence is legally sufficient to support the jury's finding that Grice failed to comply with his confidentiality agreement with Specialties and intentionally interfered with Specialties's provision-of-medical-services agreements with its clients.[18] *See City of Keller,* 168 S.W.3d at 810, 823, 827; *Hinkle,* 223 S.W.3d at 777-78; *see also Butnaru,* 84 S.W.3d at 207 (setting out elements of intentional interference with existing contract claim); *Case Corp.,* 184 S.W.3d at 769 (setting out elements of breach of contract claim). Further, considering all the evidence, including that detailed above, we conclude the evidence supporting these findings is not so weak as to be clearly wrong and manifestly unjust.[19] *See City of Keller,* 168 S.W.3d at 826; *Cain,* 709 S.W.2d at 176.

Because we conclude the evidence is legally and factually sufficient to support the jury's findings that Grice breached his confidentiality agreement and intentionally interfered with existing employee and client agreements, we resolve Helping Hands and Grice's first, second, and fifth issues against them to this extent.

## 2. Causation

Grice agreed that because of Delzell's relationship with the patients and nurses at Specialties, they could be subject to influence if she contacted them. In the context of the alleged damages, contacting a nurse to persuade that nurse's patient to transfer constituted indirect solicitation of the

---

[17] Our review of the record shows there is no evidence Grice contacted patients or nurses to entice or lure them to transfer from Specialties to Helping Hands. Therefore, we conclude there is no evidence Grice himself used Specialties's confidential information to solicit its patients. In addition, there is no evidence the information about Delzell's employment at Specialties and her skill at certifying needed services was confidential. Thus, even assuming Grice solicited Delzell to join Helping Hands, that act would not constitute use of confidential information about Delzell or her job responsibilities at Specialties.

[18] Jury questions 3 and 6.

[19] Moreover, the jury's finding as to conspiracy made Grice liable for damages resulting from Delzell's or Duckworth's breach of her employment agreement or intentional interference with existing contracts.

patient. Moreover, there was evidence that a nurse's decision to transfer from one agency to another would influence his or her patient's parent to transfer as well. Thus, there was some evidence that the eleven patients would not have transferred but for direct or indirect solicitation by Delzell or Duckworth and that the solicitation proximately caused damage to Helping Hands.

Again, there also was conflicting evidence indicating patients did not transfer to Helping Hands because of improper solicitation. However, the jury heard the evidence and resolved any conflicts in Specialties's favor. *See Maritime Overseas Corp.*, 971 S.W.2d at 407; *Hinkle*, 223 S.W.3d at 782.

Based on the evidence (and reasonable inferences), a reasonable jury could have concluded that Delzell's and Duckworth's improper solicitation of Specialties's patients resulted in their transfers to Helping Hands, causing damage to Specialties. As a result, we conclude the evidence is legally sufficient to support the jury's answers finding that Delzell's and Duckworth's acts—and, through its conspiracy finding, Grice's responsibility for those acts —proximately caused damages to Specialties.[20] *See City of Keller*, 168 S.W.3d at 810, 823, 827; *Cain*, 709 S.W.2d at 176. We reach this conclusion considering both the proximate cause standard, pursuant to which these transfers resulting in Specialties's loss of revenue would not have occurred but for the improper solicitation, *see Phoenix Refining Co.*, 81 S.W.2d at 61; *Cook Consultants, Inc.*, 700 S.W.2d at 236, and the breach of contract causation standard, pursuant to which this loss was "the natural, probable, and foreseeable consequence" of Delzell's, Duckworth's, and—through the unchallenged conspiracy finding—Grice's improper solicitation, *see Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 687 (Tex. 1981).

---

[20] Jury questions 7 and 8.

We resolve Delzell's first and third issues against her and Helping Hands and Grice's first, second, and fifth issues against them to this extent.

### 3. Joint and Several Liability

As noted above, the effect of the unchallenged conspiracy finding is to make Delzell and Grice responsible for any unlawful act committed by Delzell, Duckworth, or Grice. *See Greenberg Traurig of N.Y., P.C.*, 161 S.W.3d at 90. Consequently, Delzell and Grice are jointly and severally liable under both the breach of contract and tortious interference with existing contracts theories for Specialties's damages. *See id.*; *Carroll*, 592 S.W.2d at 925.

### 4. Breach of Fiduciary Duty Causes of Action

In her fourth issue, Delzell challenges the sufficiency of the evidence supporting the jury's affirmative answer to the question establishing her direct liability for breach of fiduciary duty. However, any error in the judgment as a result of the jury's finding on this tort claim would not result in reversal because the liability under all the theories arose from solicitation and transfer of the eleven patients discussed above. *See* TEX. R. APP. P. 47.1. Thus, we need not address Delzell's fourth issue. We also resolve Delzell's fifth issue against her, in which she argues the invalidity of any theory of liability justifies reversal of the judgment against her. *See id.*

We need not address Grice's fourth issue (challenging the sufficiency of the evidence of the jury's finding of breach fiduciary duty); and his sixth issue (the entire judgment should be reversed because all liability theories fail) because these issues duplicate Delzell's issues, which we resolved above. *See id.*

### 5. Helping Hands's Liability

Now we address Grice and Helping Hands's first and second issues—in which they argue there is legally and factually insufficient evidence of any improper solicitation or transfer as a result

of such solicitation—as those issues relate to Helping Hands's liability. The jury was asked whether it found by clear and convincing evidence (which was defined) that the harm to Specialties resulted from intentional interference with contracts attributable to Helping Hands. The charge then stated:

> You are further instructed that [Helping Hands] may be liable because of an act by Laura Delzel[1] or Johnny James Grice if, but only if—
>
> a. [Helping Hands] authorized the doing and the manner or the act, or
>
> b. Laura Delzel[1] or Johnny James Grice was unfit and [Helping Hands] was reckless in employing them, or
>
> c. Laura Delzel[1] or Johnny James Grice was employed as a vice-principal and was acting in the scope of employment, or
>
> d. [Helping Hands] or a vice-principal of [Helping Hands] ratified or approved the act.

The court submitted a supplemental charge defining "ratification"[21] and "vice-principal."[22] Accordingly, Helping Hands is liable if it intentionally interfered with Specialties's employment or client agreements thereby causing harm to Specialties or if any one of the three individuals is liable for intentional interference with those contracts.

Helping Hands's argument relating to the claim for intentional interference is that "this allegation [i.e., by hiring Specialties's at-will nurses, appellants interfered with Specialties's at-will contracts with its patients] has no legal force absent a prior showing of an illegal solicitation.

---

[21]"A party's conduct includes conduct of others that the party has ratified. Ratification may be express or implied. Implied ratification occurs if a party, though he may have been unaware of unauthorized conduct taken on his behalf at the time it occurred, retains the benefits of the transaction involving the unauthorized conduct after he acquired full knowledge of the unauthorized conduct. Implied ratification results in the ratification of the entire transaction."

[22]"The term 'vice-principal' means:
   (a) A corporate officer
   (b) A person who has authority to employ, direct, and discharge an employee of the company.
   (c) A person engaged in the performance of a nondelegable or absolute duties [sic] of the company.
   (d) A person to whom the company has confided the management of the whole or a department or division of the business of the company."

Absent that, there should be no liability . . . ."[23] However, we previously concluded the evidence was sufficient for the jury to conclude Delzell improperly solicited patients, Grice failed to comply with employment-related contracts, and Grice breached his Employment Termination and Stock Repurchase Agreement through Duckworth's use of confidential information. Helping Hands directs no argument to such use of confidential information. Nor does it challenge the sufficiency of the evidence supporting the affirmative answer to the jury question finding liability against Helping Hands for intentional interference. Helping Hands makes no argument about any of the sub-parts of the jury question, including ratification and vice-principal. Because Helping Hands does not challenge the jury's intentional interference finding, it is binding on the parties and this Court. *See Employers Cas. Co.*, 852 S.W.2d at 658. We resolve Helping Hands's first and second issues against it.[24]

## D.     Damages

The jury was asked as follows (with the answers in italics):[25]

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate [Specialties] for its damages, if any, that resulted from such action or actions?
>
> Consider . . . [only] Lost profits that were a natural, probable, and foreseeable consequence of [appellees'] action or actions.
>
> Do not add any amount for interest on damages, if any.
> Answer separately in dollars and cents for damages, if any:

---

[23] Delzell makes the same argument in her brief: "Here, Plaintiff alleges that by hiring their nurses, the defendants somehow interfered in Plaintiff's at-will contracts with its patients. But this allegation has no legal force absent a prior showing of an illegal solicitation. Unless the defendants' conduct is otherwise illegal, there should be no liability . . . ."

[24] We need not address Helping Hands's sixth issue, having addressed this issue as it relates to Grice, and Helping Hands offers no additional argument.

[25] Jury question 8. This damages question was premised on the jury's findings that Delzell or Duckworth failed to comply with employment or confidentiality agreements with Specialties (Question 1), Grice's failure to comply with employment-related agreements (Question 3), appellants' failure to comply with their fiduciary duties to Specialties (Question 5), appellants' intentional interference with Specialties's employees' or clients' agreements (Question 6), and a finding that such actions, if any, were a proximate cause of damage to Specialties.

–31–

  a.  Lost profits sustained in the past up to January 1, 2008.
Answer: $225,000.00

  b.  Lost profits sustained from January 1, 2008 to today.
Answer: $35,000.00

  c.  Lost profits that, in reasonable probability, will be sustained in the future.
Answer: $240,000.00

In Delzell's sixth issue and Helping Hands and Grice's seventh issue, they argue there is no basis for awarding lost profits accruing after the January 1, 2008 sale of Specialties. In Delzell's seventh issue and Helping Hands and Grice's eighth issue, they argue there is no evidence, or in the alternative, factually insufficient evidence supporting the jury's damages award.

## 1. The Record

Hooper testified the eleven transferring patients represented about $75,000 to $80,000 a month, or about $1 million dollars a year, in lost income to Specialties. Exhibit 40, which was admitted to show "past and future damages," listed the eleven former Specialties patients who transferred to Helping Hands and calculated lost-profit damages for each one, based on months of service and average monthly profit.[26] This evidence is undisputed. For each patient, Exhibit 40 also shows the "average monthly profit" as well as the "prior" and "future" damages, beginning on April 1, 2006, based on the number of "months on service."

## 2. Discussion

### a. Lost Profits Accruing up to the January 1, 2008 Sale

Appellants' only argument concerning pre-sale damages is to "the entire amount" and "the sum" of damages on grounds that Specialties failed to prove all eleven transferring patients were

---

[26] For each patient, Exhibit 40 shows, among other information, the "date of death or discharge" as either NA or a specific date. Additionally, there was testimony that, before Specialties was sold, two patients died and another was released; thus, the dates for each of those events limited the damages calculated for them.

solicited and that the transfers would not have occurred but for such solicitation. We have addressed those arguments under our analysis of appellants' liability. Accordingly, we conclude the evidence established the jury's award of $225,000 of lost-profits accruing up to the January 1, 2008 sale.[27] *See City of Keller*, 168 S.W.3d at 810. We resolve Delzell's seventh issue and Helping Hands and Grice's eighth issue against them.

### b. Lost Profits Accruing after the January 1, 2008 Sale

Appellants also attack the award of lost-profits damages after the January 1, 2008 sale of Specialties. They raised this argument in their motions for JNOV and for new trial. Relying on *Point Productions A.G. v. Sony Music Entertainment, Inc.*, 215 F. Supp. 2d 336, 341 (S.D.N.Y. 2002), they argue Specialties cannot recover damages of any amount that was not lost as a result of appellants' conduct. They rely on undisputed evidence that Specialties was sold effective January 1, 2008, and there was no evidence Specialties maintained any residual right to continue receiving the post-sale receipts of profits of the business after it was sold. Thus, there is no evidence that, but for appellants' conduct, Specialties would have accrued any profits from the home nursing business after January 1, 2008. Appellants' challenge is to the jury's finding of lost profits after January 1, 2008, that is, whether the amounts awarded for lost profits sustained after January 1, 2008, were proximately caused by solicitation and transfer.[28]

When a breach of a contract causes damages to an established business in the form of loss of profits, which would have been derived therefrom absent such breach of contract, the owner of such business may recover damages from the party causing such loss, measured by the amount of

---

[27] Jury question 8(a).

[28] Jury questions 8(b) and 8(c).

such loss of profits. *City of La Grange v. Pieratt*, 175 S.W.2d 243, 246 (Tex. 1943). In *Point Productions A.G.*, the court held that evidence of post-bankruptcy lost profits was inadmissible because there was no evidence the breach was a cause in fact of the bankruptcy, that is, but for the breach, the bankrupt company would have been solvent. *Point Productions A.G.*, 215 F. Supp. 2d at 341. That principle applies here because Specialties would not have realized any profits after the business was sold. Specialties's bankruptcy attorney testified the sale of the company was not in the original 2006 bankruptcy plan. In other words, the loss of profits to Specialties after January 1, 2008, was due to the sale of the business, not the loss of income from the transferring patients as of April 1, 2006.

Specialties argues it reserved this lawsuit when the business was sold and cites cases involving reservations of rights after an assignment. *See, e.g., Oxy USA, Inc. v. Sw. Energy Prod. Co.*, 161 S.W.3d 277, 289 (Tex. App.—Corpus Christi 2005, no pet.) (deciding scope of assignment). But appellants' issues here are about causation and recovery of damages, not the scope of any assignment and reservation. We conclude Specialties's authorities are not on point to the issue raised by appellants. We resolve Delzell's sixth issue and Helping Hands and Grice's seventh issue in their favor.

## IV. ADMISSIBILITY OF EVIDENCE

In Delzell's second issue and Helping Hands and Grice's third issue, they argue the trial court erred by admitting the testimony of two mothers who did not transfer their children's care to Helping Hands. Appellants argue this evidence is not admissible under rule of evidence 404(b), which provides that evidence of "other acts" is "not admissible to prove the character of a person in order to show action in conformity therewith." *See* TEX. R. EVID. 404(b). The record shows the trial court granted appellants' motion in limine seeking to exclude any testimony including alleged solicitation

of a nurse, parent, or guardian whose patient or child did not transfer to Helping Hands on grounds it was "unduly prejudicial and not probative of an element" of a cause of action regarding the transferring patients. However, a ruling on a motion in limine preserves nothing for review. *See Sw. Country Enters., Inc. v. Lucky Lady Oil Co.*, 991 S.W.2d 491, 495 (Tex. App.—Fort Worth 1999, no pet.). When the mothers' testimony by deposition was offered, appellants objected on relevance grounds, not on rule 404(b) grounds. By failing to present this specific ground timely to the trial court, appellants failed to preserve this complaint on appeal. *See id.* (citing TEX. R. APP. P. 33.1(a), TEX. R. EVID. 103(a)(1)). We resolve Delzell's second issue against her and Helping Hands and Grice's third issue against them.

## V. ATTORNEY'S FEES

The jury found $147,000 was a reasonable fee for Specialties's trial attorney's necessary services.[29] Appellants moved for JNOV, objecting to an award of attorney's fees on four grounds, including Specialties failed to plead or prove presentment. Specialties filed a response. The trial court granted appellants' JNOV on this issue.

In a "Motion to Sever and Motion for New Trial," Specialties argued the award was supported by sufficient evidence of reasonableness, and argued certain documents were evidence of presentment. Appellants responded to this motion. By written order, the trial court denied Specialties's motion.

---

[29] Jury question 12.

In two issues on cross appeal, Specialties contends the trial court erred by granting JNOV on the attorney's fees awarded by the jury and by denying Specialties's "Motion to Sever and Motion for New Trial" concerning the attorney's fee issue.

## A. Standard of Review and Applicable Law

A JNOV is proper when a directed verdict would have been proper. TEX. R. CIV. P. 301; *Fort Bend Cty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991). We review a trial court's decision to grant or deny a motion for a directed verdict and a motion for JNOV under the legal sufficiency standard of review. *City of Keller*, 168 S.W.3d at 823. A trial court properly denies a motion for a directed verdict and a motion for JNOV if, looking at all the evidence in the light most favorable to the fact challenged or the finding found by the jury, a reasonable trier of fact could have formed a firm belief or conviction that the fact or finding was true. *Id.* at 822-23.

We review a trial court's ruling on a motion for new trial for an abuse of discretion. *Dolgencorp of Tex., Inc. v. Lerma*, 288 S.W.3d 922, 926 (Tex. 2009) (per curium). We will not overrule the trial court's decision unless it acted unreasonably or in an arbitrary manner, without reference to guiding rules or principles. *Landerman v. State Bar of Tex.*, 247 S.W.3d 426, 433 (Tex. App.—Dallas 2008, pet. denied).

Recovery for attorney's fees may be predicated on a claim founded on a written contract. TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (West 2008). The civil practice and remedies code provides a procedure for recovery of attorney's fees, including that "the claimant must present the claim to the opposing party or to a duly authorized agent of the opposing party; . . . ." *Id.* § 38.002(2). The purpose of the presentment requirement is to allow the person against whom a claim

is asserted an opportunity to pay within thirty days of receiving notice of the claim, without incurring an obligation for attorney's fees. *Carr v. Austin Forty*, 744 S.W.2d 267, 271 (Tex. App.—Austin 1987, writ denied); *see Caldwell & Hurst v. Myers*, 714 S.W.2d 63, 65 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) ("Proper presentment is the assertion of a claim and a request for payment made 30 days before initiation of a suit."). In order to recover attorney's fees in a suit founded on a written contract under section 38.002, a plaintiff must plead and prove that presentment of a contract claim was made to the opposing party and he failed to tender performance. *Carr*, 744 S.W.2d at 271 (citing *Ellis v. Waldrop*, 656 S.W.2d 902, 905 (Tex. 1985)). The contract, itself, need not provide for attorney's fees. *Id.*

No particular form of presentment of a claim is required. *Id.* (citing *King Optical v. Automatic Data Processing of Dallas, Inc.*, 542 S.W.2d 213, 217 (Tex. Civ. App.—Waco 1976, writ ref'd n.r.e.)). However, neither the filing of a suit, nor the allegation of a demand in the pleadings can, alone, constitute a presentment of a claim or a demand that the claim be paid, within the meaning of section 38.002. *Id.* (citing *W. Cas. & Sur. Co. v. Preis*, 695 S.W.2d 579, 589 (Tex. App.—Waco 1985, writ ref'd n.r.e.)).

**B.    Discussion**

In its "First Amended Original Petition and Application for Injunctive Relief," Specialties contended it had agreed to pay its attorney a reasonable fee and was entitled under section 38.001 of the civil practice and remedies code to recover such reasonable attorney's fees from appellants. However, Specialties did not plead that all conditions precedent had been met. Nor did it plead that the claim had been presented to appellants and that they had failed to pay it. *See id.*

In response to the motion for JNOV and on appeal, Specialties relies on the following argument: "All Defendants received written notice of the claim before suit was filed. Settlement offers were exchanged at mediation. The Court can take judicial notice of the mediation because it was ordered by the Court." No "written notice of the claim" and no such pre-suit settlement offers or other mediation evidence were referred to in the "Motion to Sever and Motion for New Trial" or attached to it, and no record reference is provided. Specialties cites no authority to support its argument that settlement offers at mediation met the presentment requirement. Our research has produced a case, *Belew v. Rector*, 202 S.W.3d 849, 857 (Tex. App.—Eastland 2006, no pet.), in which the court rejected as insufficient to establish presentment evidence that the defendant's counsel attempted to contact the plaintiff "to discuss the dispute" and they "had some settlement discussions." The court held such evidence did not prove that "prior to trial [the defendant] had the opportunity, by undertaking specific action, to avoid paying attorney's fees." *Id.* Following the analysis in *Belew*, we reject Specialties's argument here that these facts, without more, meet the presentment requirement.

In its "Motion to Sever and Motion for New Trial," Specialties requested the trial court sever the attorney's fees issue and grant a new trial because its right to recover was a question of law for the trial court, based on the trial court's "apparently" setting aside the attorney's fees findings due to lack of evidence of presentment. In that motion, Specialties relied on the "Agreed Order for Temporary Injunction" and the "Agreed Extension of Temporary Restraining Order" as evidence of presentment. The Agreed Order refers, in part, to appellants' failure to acknowledge or admit the truth of the allegations in the Original Petition and to the necessity for discovery, but neither

document says anything about the proof of the amount owing. Neither document contains a specific demand from Specialties for payment. *Cf. Carr*, 744 S.W.2d at 271. (termination letter delivered to trustee of partnership stated, "I am terminating the contract and ask that you release the $50,000 letter of credit to me[]" held evidence of presentment of claim). We cannot agree that filing these documents meets the purpose of the presentment requirement, which is to allow the person against whom a claim is asserted an opportunity to pay within thirty days of receiving notice of the claim, without incurring an obligation for attorney's fees. *See id.*

Specialties argues the trial court should have reopened the case if there were a deficiency in evidence to support attorney's fees and it should have severed that issue and granted a new trial. However, neither of these options applies here because the evidence is insufficient to show Specialties met the procedural requirements for the award. Specialties's authorities do not persuade us otherwise. *See Doctor's Hosp. 1997, L.P. v. Sambuca Houston, L.P.*, 154 S.W.3d 634, 639 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (trial court should not have reopened evidence to permit testimony on attorney's fees because appellant not entitled to attorney's fees on promissory estoppel claim); *Uhl v. Uhl*, 524 S.W.2d 534, 538 (Tex. App.—Fort Worth 1975, no writ) (trial court should have considered attorney's fees as necessaries as part of support money recovery per statute).

Having rejected Specialties's arguments that the trial court improperly granted JNOV on the issue of attorney's fees and improperly denied the post-verdict motions on this issue on grounds of lack of presentment, we resolve Specialties's issues on cross-appeal against it.

## VI. CONCLUSION

Because of our resolution of appellants' issues, we reverse the trial court's final judgment awarding damages to Specialties. We render judgment that Specialties shall recover $225,000 against Helping Hands, Delzell, and Grice. We reverse the trial court's award of prejudgment and postjudgment interest and remand this cause to the trial court for the determination of prejudgment and postjudgment interest. In all other respects, the trial court's final judgment is affirmed.

_____
JIM MOSELEY
JUSTICE

081657F.P05



# Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

HELPING HANDS HOME HEALTH
CARE, INC. D/B/A AT HOME
HEALTHCARE; LAURA DELZELL; AND
JOHNNY JAMES GRICE,
Appellants/Cross Appellees

Appeal from the 160th Judicial District
Court of Dallas County, Texas. (Tr.Ct.No.
Cause No. 06-03351-H).
Opinion delivered by Justice Moseley,
Justices Richter and Myers participating.

No. 05-08-01657-CV          V.

HOME HEALTH OF TARRANT
COUNTY, INC. D/B/A HOME HEALTH
SPECIALTIES, Appellee/Cross Appellant

We **VACATE** our November 21, 2012 judgment. This is now the judgment of the Court.

Based on the Court's opinion of this date, the final judgement of the trial court awarding damages to appellee/cross appellant Home Health of Tarrant County, Inc. D/B/A Home Health Specialties is **REVERSED**. Judgment is **RENDERED** that appellee/cross appellant Home Health of Tarrant County, Inc. D/B/A Home Health Specialties shall recover $225,000.000 against appellants/cross appellees Helping Hands Home Care, Inc. D/B/A/ At Home Healthcare; Laura Delzell; and Johnny James Grice, jointly and severally.

We **REVERSE** the trial court's awards of prejudgment and postjudgment interest and **REMAND** this cause to the trial court for the determination of prejudgment and postjudgment interest.

In all other respects, the final judgment is **AFFIRMED**.

It is **ORDERED** that appellants/cross appellees Helping Hands Home Care, Inc. D/B/A/ At Home Healthcare; Laura Delzell; and Johnny James Grice recover their costs of this appeal from appellee/cross appellant Home Health of Tarrant County, Inc. D/B/A Home Health Specialties.

Judgment entered January 29, 2013.

_____
JIM MOSELEY
JUSTICE