**Affirm in part, Reverse in part, and Modify; Opinion Filed April 9, 2020**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-18-01360-CV

**JEROME SANDBERG, Appellant**

**V.**

**STMICROELECTRONICS, INC., Appellee**

**On Appeal from the 298th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-15-14938**

## OPINION

Before Justices Myers, Carlyle, and Evans
Opinion by Justice Myers

Jerome Sandberg appeals the judgment in favor of STMicroelectronics, Inc. (ST).  Sandberg brings sixteen issues contending the trial court erred by (a) granting ST's motion for summary judgment on Sandberg's *Sabine Pilot* claim; (b) denying Sandberg's motion for summary judgment and partially granting ST's motion for summary judgment on ST's breach of contract claim; (c) rendering judgment for ST on its breach of contract claim; (d) admitting and excluding certain evidence; (e) permanently enjoining Sandberg from certain actions; and (f) awarding ST its attorney's fees and certain categories of its costs.  We conclude the evidence was

factually insufficient to support the award of attorney's fees for representation before the Supreme Court of Texas, and we remand that issue to the trial court for further proceedings. We also conclude the trial court erred by providing in the injunction order that ST would be entitled to recover its attorney's fees if Sandberg violated the injunction, and we modify the judgment to delete that provision. We affirm the trial court's judgment in all other respects.

## BACKGROUND

Sandberg is a certified public accountant and tax attorney. ST is a semiconductor company doing business in many countries.

In 2011, Sandberg went to work for ST in Texas as its Director of Tax for the Americas. Sandberg signed a confidentiality agreement promising not to use, publish, or disclose ST's information except as required by his duties for ST. Sandberg also agreed that when he left ST's employment, he would "promptly deliver (to a designated representative) all documents and other records which relate to the business activities of ST and all materials which belong to ST." As part of his job, Sandberg had access to confidential information concerning ST. ST provided Sandberg with a laptop computer to perform his work for ST.

In his position with ST, Sandberg signed tax forms, reports, and other documents certifying that the numbers on those documents were correct. In 2015, Sandberg became concerned that the numbers he was given to be included in the documents were incorrect. Sandberg reported his concerns to ST's management,

and he made it clear to ST's management that he would not sign tax returns and other documents that he suspected contained incorrect numbers.

On Thursday, December 10, 2015, Bruce Quill (ST's human resources manager) and Sandberg's manager had a meeting with Sandberg in Sandberg's office. The meeting began at 7:30 a.m. and lasted forty minutes. In that meeting, Quill told Sandberg that Sandberg's position was being eliminated and that it was his last day. Quill explained that, pursuant to the confidentiality agreement, Sandberg needed to return ST's laptop computer without copying any files from it, and that Sandberg was eligible for a severance package worth about $100,000. The severance package agreement stated that the amounts in the severance package "constitute a compromise of any claims You may have the right to assert arising from your employment by ST or the termination thereof." Sandberg refused the severance package because, he testified, it did not pay him for his accrued vacation time, his accrued bonus for the year, stock grants, or the salary he had deferred, which together were worth over $100,000.

Forensic analysis of the laptop computer issued to Sandberg showed that after the 7:30 a.m. meeting when Quill told Sandberg he was terminated, Sandberg began downloading files from the computer. He first tried to download his e-mail files onto a DVD, but it did not have sufficient memory. He then downloaded the e-mail files and other files onto an HP thumb drive. He also downloaded files onto an unbranded thumb drive and a SanDisk thumb drive.

At about 10:00 a.m., Quill stopped by Sandberg's office and asked Sandberg to come to his office. Sandberg told Quill he was wrapping things up, that he needed to send a final e-mail, and that he would come by when he finished.

When Sandberg went to Quill's office, Quill conducted an exit interview, which included collection of ST's property. Sandberg handed over his security badge, keys, and cell phone, but Sandberg refused to return the laptop computer. Quill said that if Sandberg did not return the computer, then Quill would have to notify the police. Sandberg told Quill it was not personal, but he could not return the computer. Sandberg took the computer with him when he left ST's building. Quill sent Sandberg an e-mail telling him to return the computer by noon the next day, not to copy any files on the computer or retain any of ST's information, and to certify that he had not copied any computer files.

Sandberg testified he did not go home that evening and did not see Quill's e-mail until it was too late the next day to return the computer by noon. At about 11:30 a.m. on Friday, December 11, Sandberg copied more files from the computer onto the HP thumb drive.

When Sandberg did not return the computer on December 11, Quill sent Sandberg an e-mail telling him he was terminated for cause and that the prior severance-and-benefits offers were withdrawn. The same day, ST filed suit against Sandberg seeking damages and injunctive relief.

The following Sunday, December 13, 2015, Sandberg told Quill he had located the computer and would return it the following day. On Monday, December 14, 2015, Sandberg went to ST's building and left the computer with the receptionist. Sandberg did not leave any storage devices with the computer, he did not tell ST he had copied files from the computer, and he did not certify that he had not copied any files.

The same day, ST hired Lee Whitfield to conduct a forensic analysis of the computer to determine whether Sandberg had copied any files after his termination. Whitfield analyzed the computer and discovered the activity described above.

ST demanded that Sandberg turn over any files he had copied, but he did not comply. Only after the trial court ordered Sandberg to turn over to ST all computer files he had copied did Sandberg turn over any data storage devices to ST. On March 4, 2016, Sandberg turned over the HP and unbranded thumb drives and a CD-ROM to ST.[1] Whitfield examined them and determined that files had been copied from the HP thumb drive onto the unbranded thumb drive "on 12/17/2016 [sic], a week after Mr. Sandberg left ST Micro." He stated in his report that a computer other than ST's laptop computer must have been used to copy the files. He also stated that files had been deleted from the HP thumb drive. He determined that the CD-ROM was

---

[1] Sandberg's attorney testified that some of Sandberg's e-mails that were subject to the court's order were on his computer. He cut and pasted the files from his computer onto the CD-ROM and turned over the CD-ROM to ST's attorneys.

created on March 3, 2016, it contained material that originated with ST, and it was created with a computer other than ST's laptop.

On April 27, 2016, Sandberg turned over three storage cards. One of the storage cards was damaged and could not be read, and the other two had been reformatted, removing their data. On May 24, 2016, Sandberg turned over the SanDisk thumb drive and another thumb drive. Whitfield determined they both had once contained ST's information, but they had been reformatted, which prevented Whitfield from analyzing them more thoroughly. Sandberg admitted that the reformatted thumb drives had once contained information related to ST's business activities.

Sandberg filed a counterclaim against ST, alleging he had been wrongfully discharged for refusing to violate the law. Sandberg and ST filed cross-motions for summary judgment on the counterclaim. The trial court granted ST's motion, denied Sandberg's motion, and ordered that Sandberg take nothing on his counterclaim.

The parties also filed cross-motions for summary judgment on ST's claim against Sandberg for breach of contract. The trial court granted ST's motion for summary judgment in part and denied Sandberg's. The trial court concluded that ST had established as a matter of law that the Intellectual Property/Confidentiality Statement Sandberg had signed was a contract supported by consideration. The trial court denied the motion for summary judgment as to whether Sandberg breached the Intellectual Property/Confidentiality Statement and the amount of ST's damages.

ST's claims against Sandberg for breach of contract and misappropriation of trade secrets were tried before a jury. At the trial, ST sought as damages the funds it paid Whitfield for analyzing the computer and data storage devices. The jury found Sandberg breached the contract and awarded ST actual damages of $22,034.46 and attorney's fees through trial of $1,346,658.79. The jury also answered that a reasonable fee for representation before the court of appeals and the supreme court was $0. The jury found that ST failed to prove that Sandberg misappropriated ST's trade secrets. The trial court awarded ST the damages and attorney's fees through trial found by the jury. The trial court also awarded ST appellate attorney's fees of $50,000 for representation in the court of appeals, and up to $200,000 for representation before the supreme court.

## SUMMARY JUDGMENT

In his first two issues, Sandberg contends the trial court erred by granting ST's motions for summary judgment and by denying Sandberg's motions for summary judgment.

### Standard of Review

The standard for reviewing a traditional summary judgment is well established. *See McAfee, Inc. v. Agilysys, Inc.*, 316 S.W.3d 820, 825 (Tex. App.—Dallas 2010, no pet.). The movant has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). In deciding whether a disputed material fact issue exists precluding

summary judgment, evidence favorable to the nonmovant will be taken as true. *In re Estate of Berry*, 280 S.W.3d 478, 480 (Tex. App.—Dallas 2009, no pet.). Every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005). We review a summary judgment de novo to determine whether a party's right to prevail is established as a matter of law. *Dickey v. Club Corp.*, 12 S.W.3d 172, 175 (Tex. App.—Dallas 2000, pet. denied).

We review a no-evidence summary judgment under the same legal sufficiency standard used to review a directed verdict. *See* TEX. R. CIV. P. 166a(i); *Flood v. Katz*, 294 S.W.3d 756, 762 (Tex. App.—Dallas 2009, pet. denied). Thus, we must determine whether the nonmovant produced more than a scintilla of probative evidence to raise a fact issue on the material questions presented. *See Flood*, 294 S.W.3d at 762. When analyzing a no-evidence summary judgment, we consider all the evidence in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the movant. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006) (quoting *City of Keller*, 168 S.W.3d at 824). A no-evidence summary judgment is improperly granted if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). "More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable, fair-minded persons to differ in their conclusions." *Id.* (quoting *Merrell*

*Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *Id.* (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

When both parties move for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law. *Guynes v. Galveston Cty.*, 861 S.W.2d 861, 862 (Tex. 1993); *Howard v. INA Cty. Mut. Ins. Co.*, 933 S.W.2d 212, 216 (Tex. App.—Dallas 1996, writ denied). Neither party can prevail because of the other's failure to discharge its burden. *Guynes*, 861 S.W.2d at 862; *Howard*, 933 S.W.2d at 216. When both parties move for summary judgment, we consider all the evidence accompanying both motions in determining whether to grant either party's motion. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). When the trial court grants one motion and denies the other, the reviewing court should determine all questions presented. *Id.* The reviewing court should render the judgment that the trial court should have rendered. *Id.* When a trial court's order granting summary judgment does not specify the grounds relied upon, the reviewing court must affirm the summary judgment if any of the summary judgment grounds are meritorious. *Id.*

### Sandberg's Counterclaim for Wrongful Discharge

In his first issue, Sandberg contends the trial court erred by granting ST's traditional motion for summary judgment on his counterclaim for wrongful

discharge. Sandberg alleged he was terminated for refusing to commit an unlawful act, namely, signing IRS and other financial documents containing false information.

In Texas, absent a specific agreement to the contrary, employment is considered to be at will. That is, "employment may be terminated by the employer or the employee at will, for good cause, bad cause, or no cause at all." *Montgomery Cty. Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998). In *Sabine Pilot Service, Inc. v. Hauck*, 687 S.W.2d 733 (Tex. 1985), the supreme court held that public policy required a narrow exception to the doctrine of employment at will. "That narrow exception covers only the discharge of an employee for the sole reason that the employee refused to perform an illegal act." *Id.* at 735.

ST moved for summary judgment on Sandberg's fourth amended counterclaim, which was Sandberg's live pleading when ST filed its motion for summary judgment. In the motion for summary judgment, ST asserted Sandberg's fourth amended counterclaim did not allege that ST required him to perform an illegal act that he refused to perform. Sandberg filed his fifth amended counterclaim with his response. ST did not amend its motion for summary judgment after Sandberg amended his counterclaim. We must determine whether the trial court correctly concluded that Sandberg's fifth amended counterclaim did not plead a *Sabine Pilot* cause of action.[2]

---

[2] Generally, claims should not be dismissed due to pleading defects unless the plaintiff has been given the opportunity to replead. *See Sixth RMA Partners, L.P. v. Sibley*, 111 S.W.3d 46, 54–55 (Tex. 2003)

Sandberg's fifth amended counterclaim and his affidavit describe his job duties as including "execution of income tax returns and APA [Advanced Pricing Agreement] reports filed with the Internal Revenue Service and numerous state income tax returns." They also describe how Sandberg was concerned that ST was engaging in illegal tax and accounting practices. Sandberg reported his concerns to ST's management. Sandberg and Quill met in October and December 2015 to discuss Sandberg's concerns. During those meetings, Sandberg repeatedly stated he could not execute the 2015 tax returns and APA report or sign off on the financial year-end reporting if there was a breach of the APA or if improper adjusting entries were included in the accounting figures. On December 9, 2015, Quill sent Sandberg an e-mail stating that "no evidence of improper conduct was discovered." Sandberg was terminated the next day. Sandberg alleged that his termination "was for the sole reason that Sandberg refused to perform illegal acts."

ST asserted in its motion for summary judgment that Sandberg's petition failed to allege a claim under *Sabine Pilot* because Sandberg did not allege that ST required him to perform an illegal act. Sandberg argues that *Sabine Pilot* does not require that the employer have required the employee to do an illegal act. We agree

_____

(when pleading defect could be cured by amendment, summary judgment due to the pleading defect is improper unless the trial court first sustained a special exception and permitted the plaintiff an opportunity to cure the defect). Sandberg does not argue on appeal that he should have been permitted to replead his counterclaim for wrongful discharge. Accordingly, we do not address whether the trial court should have permitted Sandberg to replead his counterclaim before the court granted ST's motion for summary judgment.

–11–

with ST that *Sabine Pilot*, as interpreted in subsequent cases, requires that the employer required the employee to do an illegal act.

In *Ed Rachal Foundation v. D'Unger*, 207 S.W.3d 330 (Tex. 2006) (per curiam), the supreme court stated, "*Sabine Pilot* protects employees who are asked to commit a crime, not those who are asked not to report one." *Id.* at 332 (emphasis omitted). In *Winters v. Houston Chronicle Publishing Co.*, 795 S.W.2d 723 (Tex. 1990), the supreme court concluded that, for the employee to prevail, the employee must prove he was "unacceptably forced to choose between risking criminal liability or being discharged from his livelihood." *Id.* at 724. In *Safeshred, Inc. v. Martinez*, 365 S.W.3d 655 (Tex. 2012), the supreme court stated this policy was "to prevent employers from forcing employees to choose between illegal activity and their livelihoods." *Id.* at 659. Although it is not expressly stated as an element in *Sabine Pilot*, it is implicit in the policy as stated in *Winters* and *Safeshred* that the employer must require the employee to commit an illegal act. *See Burt v. City of Burkburnett*, 800 S.W.2d 625, 627 (Tex. App.—Fort Worth 1990, writ denied) (in *Winters*, "the [supreme] court implicitly acknowledges the requirement that an employee be required by his employer to break the law or to face termination."). If the employer did not require the employee to commit an illegal act, then the employer was not "forcing employees to choose between illegal activity and their livelihoods." *Safeshred*, 365 S.W.3d at 659. The supreme court also said in *Safeshred* that *Sabine Pilot* claims "sound in tort, providing a remedy when an employee refuses to comply

–12–

with an employer's directive to violate the law and is subsequently fired for that refusal." *Safeshred*, 365 S.W.3d at 660. If there is no "directive to violate the law," then *Sabine Pilot* does not provide a remedy. *See id.*

Sandberg's counterclaim and affidavit contain no allegation that ST required him to commit an illegal act. Sandberg states in his affidavit that he told Quill he would not sign the financial documents "if there was a breach of the APA agreement and improper adjusting entries were included in the accounting figures." Sandberg did not allege or testify that ST required him to execute false documents, only that he was concerned that the company would do so.

The question, then, is whether an employee's termination for unilaterally declaring to his employer that he will not violate the law if required to do so by the employer presents a cause of action under *Sabine Pilot*. This Court faced a similar set of facts in *Tollack v. Allianz of America Corp.*, No. 05-91-01943-CV, 1993 WL 321458 (Tex. App.—Dallas Aug. 16, 1993, writ denied) (not designated for publication). Tollack was the associate vice-president of taxation for Allianz and was on the company's tax committee. At a meeting of the committee, Tollack stated he thought a $10 million payment to shareholders should be treated as current equity. The rest of the committee thought the payment should be treated as retained earnings. Tollack told the committee that if the payment were treated as retained earnings, then he would not assist in the preparation or signing of the tax return. Tollack was terminated the next day. *Id.* at *1. Tollack sued Allianz alleging

wrongful termination under *Sabine Pilot*. *Id.* at *2. Allianz moved for summary judgment, which the trial court granted. On appeal, Tollack argued he met his summary judgment burden by presenting evidence that his position required him to sign tax statements submitted to the IRS, and his termination for stating he would not sign tax statements he considered incorrect fell within the employment-at-will exception of *Sabine Pilot*. *Id.* This Court affirmed the summary judgment, agreeing with the Forth Worth Court of Appeals' opinion in *Burt v. City of Burkburnett* that to fall within the *Sabine Pilot* exception, "the employer must, in some form *require* the employee to commit an illegal act." *Id.* at *3 (citing *Burt*, 800 S.W.2d at 627). We stated, "It is not enough that Tollack unilaterally refused to perform an act that was to occur in the future based on his belief that such an act was illegal." *Id.*; *see also Prigmore v. Wilson Engraving Co.*, No. 05-92-02125-CV, 1993 WL 209654, at *3 (Tex. App.—Dallas June 15, 1993, writ dism'd w.o.j.) (not designated for publication) ("In the absence of summary judgment evidence that Wilson Engraving required Prigmore to commit an alleged illegal act, he does not fit within the purview of the *Sabine Pilot* exception. It is not enough that Prigmore unilaterally refused to perform an act based on his belief that such act was illegal." (citation omitted)).

Sandberg points out that *Tollack* has no precedential value because it is an opinion before 2003 that was not designated for publication. *See* TEX. R. APP. P. 47.7(b). However, its analysis is sound. As the supreme court stated in *Safeshred*, *Sabine Pilot* claims "sound in tort, providing a remedy when an employee refuses to

–14–

comply with an employer's directive to violate the law and is subsequently fired for that refusal." *Safeshred*, 365 S.W.3d at 660. An employee who is terminated after unilaterally declaring he will refuse to violate the law when his employer has not yet asked him to do so does not have a claim under *Sabine Pilot*. This is consistent with the policy of *Sabine Pilot* that its exception to the employment-at-will doctrine was "to prevent employers from forcing employees to choose between illegal activity and their livelihoods." *Id.* at 659.

Sandberg also argues that *Tollack* is distinguishable because the accounting entries in that case had not yet been made when Tollack was terminated, while in this case, the allegedly illegal accounting entries had been made when Sandberg was terminated, and execution of the tax and financial documents based on those accounting entries was due in the months after Sandberg's termination. While this distinction may be true, Sandberg did not plead or present evidence that ST ever required him to sign false tax statements or other financial documents. Instead, the gist of his claim is that he was terminated for stating he would not execute the documents "*if* there was a breach of the APA agreement and improper adjusting entries were included in the accounting figures" (emphasis added). Sandberg's pleading does not allege facts showing ST forced Sandberg "to choose between illegal activity and [his] livelihood[]." *Safeshred*, 365 S.W.3d at 659.

We conclude Sandberg has not shown the trial court erred by granting ST's motion for summary judgment on Sandberg's counterclaim. We overrule Sandberg's first issue.

**Summary Judgment on ST's Claim for Breach of Contract**

In his second issue, Sandberg contends the trial court erred by denying his motion for summary judgment and by granting in part ST's motion for summary judgment on ST's claim for breach of contract. ST sued to enforce the "Intellectual Property/Confidentiality Statement" (confidentiality agreement) alleging the confidentiality agreement was a contract that Sandberg breached by not returning the computer timely and by copying and keeping computer files without authorization. The trial court stated in its order granting ST's motion for summary judgment that the confidentiality agreement "is a valid contract between Plaintiff and Defendant with no lack of consideration or failure of consideration."

On appeal, Sandberg argues the trial court's rulings on the motions for summary judgment were erroneous because there was no evidence of consideration to support the confidentiality agreement as a contract and no evidence of an offer by ST or acceptance by Sandberg.

*Consideration*

Sandberg first argues there was no evidence that his promises in the confidentiality agreement were supported by consideration. On October 24, 2011, before Sandberg was an employee of ST, ST made him an employment offer. The

–16–

offer listed the salary and benefits Sandberg would receive if he accepted, and it also provided: "As an ST employee, you will be required to sign documentation with respect to the treatment of confidential information and intellectual property." Sandberg signed the job offer, as did Quill on behalf of ST. On Sandberg's first day of work at ST, November 12, 2011, Sandberg signed the confidentiality agreement. The confidentiality agreement contained the following concerning consideration:

> In consideration of my employment with ST, . . . or the continuation of my employment if I am already in the employ of ST at the time I sign this Agreement, and in consideration of the position of trust and confidence which I assume, I understand and agree to the following provisions for the protection of ST Property rights . . . ."

The confidentiality agreement also stated,

> The ability of [ST] to succeed, depends, to a significant degree, on its possession of proprietary information . . . . This results in a pool of information which enables ST to conduct its business competitively and thus benefit its employees. . . . In effect, all employees have a common interest and responsibility in assuring that no employee accidentally or intentionally disclose [sic] any part of this pool of information.

Sandberg argues the confidentiality agreement is not supported by consideration because the only consideration mentioned in the agreement is his employment. Sandberg asserts the promise of employment was illusory because Sandberg was an at-will employee. *See Light v. Cent. Cellular Co. of Tex.*, 883 S.W.2d 642, 644–45 (Tex. 1994) ("Consideration for a promise, by either the employee or the employer in an at-will employment, cannot be dependent on a period of continued employment. Such a promise would be illusory because it fails to bind the promisor who always retains the option of discontinuing employment in

–17–

lieu of performance."). However, Sandberg's employment was not the only consideration in this case.

An employer's promise to provide confidential information, followed by provision of that information, is sufficient consideration to support confidentiality agreements. *See Eurecat US, Inc. v. Marklund*, 527 S.W.3d 367, 390 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *Jon Scott Salon, Inc. v. Garcia*, 343 S.W.3d 532, 535 (Tex. App.—Dallas 2011, no pet). The promise to provide the confidential information is implied if the job position "will reasonably require the employer to provide confidential information to the employee for the employee to accomplish the contemplated job duties." *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 845–46 (Tex. 2009); *see also id.* at 850 ("When the nature of the work the employee is hired to perform requires confidential information to be provided for the work to be performed by the employee, the employer impliedly promises confidential information will be provided.").[3]

Quill testified for ST in his affidavit that "Sandberg had continuing access to, and he did access, ST's confidential and proprietary information by the use of the

_____

[3] Sandberg argues that *Mann Frankfort* is distinguishable because the employer provided the confidential information on the employee's first or second day of work, while in this case, the summary judgment record does not show when ST first provided confidential information to Sandberg. However, that does not matter. The record establishes that ST provided confidential information to Sandberg before he was terminated. This action by ST provided sufficient consideration for Sandberg's agreement to protect and return the confidential information ST provided. As Justice Willett explained, "the employer must *at some point* provide consideration for the agreement, such as confidential information, in order for the agreement to be enforceable." *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 781 n.9 (Tex. 2011) (Willett, J., concurring) (emphasis added).

Company Computer." Quill then listed six categories of "highly-sensitive and non-public information" that Sandberg accessed. Gary Leake, ST's Tax Manager, testified in his affidavit that he and Sandberg exchanged e-mails that "discussed highly sensitive and non-public information of ST that was subject to ST's policies." Leake presented similar testimony in his deposition. Quill's and Leake's testimony constituted evidence that ST had to provide Sandberg with its confidential information for Sandberg to accomplish his job duties and that ST provided him with this information. Sandberg does not dispute that ST's confidential information was necessary for his job and that he had access to ST's confidential information.

Sandberg argues that ST did not assert in its response to Sandberg's motion for summary judgment that the confidentiality agreement was a unilateral contract that became enforceable when ST provided confidential information to Sandberg. Although ST did not use the word "unilateral" in its response when discussing the agreement, that was the gist of its argument that this case is analogous to *Mann Frankfort*.

We conclude ST conclusively established that the confidentiality agreement was supported by consideration and that Sandberg failed to raise a genuine issue of material fact concerning whether the confidentiality agreement was supported by consideration.

*Offer and Acceptance*

Sandberg also argues the trial court erred by granting ST's motion for summary judgment and denying Sandberg's motion for summary judgment because there was no evidence of offer and acceptance of the confidentiality agreement. Sandberg argues there was no evidence because no one signed the confidentiality agreement on ST's behalf. In this case, the offer is contained in the October 24, 2011 job offer, which was signed by Quill on ST's behalf and by Sandberg. The offer stated, "As an ST employee, you [Sandberg] will be required to sign documentation with respect to the treatment of confidential information and intellectual property." Sandberg accepted that requirement when he signed the job offer on October 24, 2011. He further accepted it when he signed the confidentiality agreement on his first day of work on November 12, 2011. The fact that no executive for ST signed the confidentiality agreement does not make the confidentiality agreement nonbinding.

We conclude the trial court did not err by granting ST's motion for summary judgment and denying Sandberg's motion for summary judgment on ST's claim. We overrule Sandberg's second issue.

## ST'S DAMAGES

In his third through sixth issues, Sandberg challenges the trial court's award of damages to ST.

## Expert Witness Fees as Actual Damages

In his third issue, Sandberg contends the trial court erred by awarding ST any damages because the fees of expert witnesses are not recoverable as damages. Sandberg argues that the only evidence ST presented of its alleged damages was the amounts it paid Whitfield, who also testified as a paid expert witness for ST.

ST hired Whitfield on December 14, 2015, to examine the laptop computer after Sandberg returned it. Whitfield conducted forensic examinations of the computer and the data storage devices. He prepared reports for ST of the results of his examinations. Whitfield also testified in court as an expert witness concerning those results. ST sought to recover as damages the amounts it paid Whitfield for examining the computer and data storage devices and for preparing the reports.

Sandberg contends the fees paid to Whitfield were not damages because the fees paid to expert witnesses are not recoverable damages.

> It is the general rule in Texas that expenses incurred in prosecuting or defending a suit are not recoverable as costs or damages unless recovery of those items is expressly provided for by statute, is available under equitable principles, or is expressly provided for by contract. The rule [applies] to attorney's fees, costs of experts, and other expenses in preparation for trial . . . .

*Shenandoah Assocs. v. J & K Props., Inc.*, 741 S.W.2d 470, 486 (Tex. App.—Dallas 1987, writ denied) (op. on rehearing) (internal quotation marks omitted). Sandberg argues that because Whitfield was not hired until after suit was filed and because Whitfield testified as an expert witness, the amounts ST paid him are "expenses in preparation for trial" and are not recoverable as damages. *Id.* Sandberg asserts that

damages must be "the natural, probable, and foreseeable consequence of the defendant's conduct." *Mead v. Johnson Grp., Inc.*, 615 S.W.2d 685, 687 (Tex. 1981). He argues that Whitfield's fees were not the natural, probable, and foreseeable consequence of his conduct of keeping the computer when he was terminated.

Whitfield testified that he was hired "to analyze some computer materials taken from ST by Mr. Sandberg." Whitfield stated, "ST was concerned that Mr. Sandberg may have used the time between leaving the company and returning the computer to copy data." Whitfield testified that his invoices to ST for his "remedial analysis" were $24,932.38. The jury found ST's damages from Sandberg's breach of the confidentiality agreement were $22,034.46.

The issue is whether Whitfield's work to determine whether Sandberg downloaded data from the computer following his termination was the natural, probable, and foreseeable consequence of Sandberg's taking ST's computer with him when he left and not returning it until four days later. The computer contained ST's confidential information. ST had security systems in place to protect that information, including the confidentiality agreement and courses Sandberg took about protecting ST's confidential information. The trial court and the jury could find that one of the systems ST had to protect its information was the requirement its employees at their termination return "all documents and other records which relate to the business activities of ST and all materials which belong to ST."

Sandberg violated this requirement by leaving the premises with the computer when he was terminated. The jury could find that, when Sandberg returned the computer four days later without certifying that he had not copied any files, ST had to have the computer examined to determine whether Sandberg had copied any files. The jury and the trial court could conclude that Whitfield's fees for the forensic examination of the computer and data storage devices to determine whether Sandberg had copied information and then to determine whether any information copied was returned were the natural, probable, and foreseeable consequence of Sandberg's conduct of keeping the computer when he was terminated.

Sandberg also appears to argue that Whitfield did not segregate the fees for his forensic-analysis work from the fees for his work as an expert witness in the litigation. The record shows adequate segregation of the fees. Four of Whitfield's invoices to ST are for forensic analysis, imaging, collection, and investigation and for "Investigation for ST Micro Electronics." These four invoices total $22,034.46, the amount found by the jury. The remaining invoices, totaling $16,379.64, were for items associated with his work as a testifying expert witness, including "testimony," "Deposition preparation," "Testimony at hearing," "Review and sign affidavit," and "Meeting with [attorney] regarding preparation for hearing." These amounts, which were expenses in preparation for trial, were not included in the damages found by the jury.

Sandberg appears to argue that all of Whitfield's fees must be expenses in preparation for trial because he was hired after ST filed suit. Sandberg cites no authority in support of this argument. ST filed suit before Sandberg returned the computer. It was only after Sandberg returned the computer that ST incurred the expenses for forensic analysis of the computer. The fact that the expenses were incurred after suit was filed does not prevent them from being damages.

In his third, fourth, and fifth issues, Sandberg contends that Whitfield's fees for the forensic examinations of the computer and data storage devices were not damages or were not direct damages because they did not result from Sandberg's wrongful acts alleged by ST. "In an action for breach of contract, actual damages may be recovered when loss is the natural, probable, and foreseeable consequence of the defendant's conduct." *Mead*, 615 S.W.2d at 687. Sandberg argues that if the expenses were damages at all, they were consequential damages that had to be specifically pleaded. "Direct damages compensate for the loss that is the necessary and usual result of the defendant's act. Consequential damages, by contrast, are damages that result naturally, but not necessarily, from the defendant's wrongful act." *PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 713 (Tex. App.—Dallas 2011, pet. denied) (citing *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007) (per curiam)). The jury could conclude that Sandberg's taking the laptop computer with its confidential information home with him after he was terminated and not returning it for four days created a need for ST to know whether

–24–

Sandberg had compromised the confidentiality of its data by copying it. ST's need to protect the confidentiality of its information required a forensic examination of the computer by Whitfield. The jury could also conclude that when ST learned that Sandberg had indeed copied its information, ST needed to know whether the data storage devices Sandberg turned over contained that information and whether they had been copied, which required a forensic examination of the devices. We conclude Whitfield's fees for the forensic examination of the computer and data storage devices were "the natural, probable, and foreseeable consequence of [Sandberg's] conduct." *Mead*, 615 S.W.2d at 687. We also conclude that ST's need to have the computer and data storage devices forensically examined after Sandberg returned them was a necessary and usual result of Sandberg's act and were direct damages from Sandberg's taking the computer with him and copying information from it.

We overrule Sandberg's third, fourth, and fifth issues.

### ADMISSION AND EXCLUSION OF EVIDENCE

In his sixth and seventh issues, Sandberg contends the trial court erred by admitting and excluding certain evidence. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005) (per curiam). We will uphold the ruling if there is any legitimate basis in the record to support it. *Ten Hagen Excavating, Inc. v. Castro-Lopez*, 503 S.W.3d 463, 490 (Tex. App.—Dallas 2016, pet. denied). To reverse an erroneous evidentiary ruling, an appellant must both establish error and show that the error

probably caused an improper judgment. TEX. R. APP. P. 44.1; *Thawer v. Comm'n for Lawyer Discipline*, 523 S.W.3d 177, 183 (Tex. App.—Dallas 2017, no pet.).

## Discovery Abuse

In his sixth issue, Sandberg contends the trial court erred by granting judgment to ST on its breach-of-contract claim because Whitfield did not provide Sandberg with the information Whitfield prepared. Sandberg argues the trial court should have excluded Whitfield's testimony.

Whitfield performed his forensic analysis by creating a mirror image of the computer's hard drive as well as of the data storage devices Sandberg turned over to ST. Whitfield then ran software and applications on the mirror images. The software and applications provided the results on a computer screen, and Whitfield used those results to reach his opinions and to prepare his reports. Whitfield did not print the screen results. Whitfield testified that without the mirror images and the screen results, it would be impossible for someone else to test the computer and data storage devices to verify the accuracy of his work.

Rule of Civil Procedure 192.3(e)(6) provides, "A party may discover the following information regarding a testifying expert[:] . . . (6) all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of a testifying expert's testimony . . . ." TEX. R. CIV. P. 192.3(e)(6); *see also id.* 194.2(f)(4)A). Sandberg requested this information. ST stated in its discovery responses that it provided Sandberg with

the reports Whitfield prepared, but ST did not produce copies of the mirror images or the screen results.

The record contains no evidence of whether Whitfield's forensic examination of the computer was "in anticipation of [his] testimony." *Id.* 192.3(e)(6). Therefore, we cannot say the trial court's decision to admit Whitfield's testimony, at least as to the computer, was an abuse of discretion.

However, even if it were an abuse of discretion, we could not reverse unless the admission of his testimony was harmful to Sandberg. He argues it was harmful because Whitfield's testimony was the only evidence of whether Sandberg copied ST's files. We disagree.

Whitfield's testimony was that the results of his forensic examination showed Sandberg had copied files from the computer and that the data storage devices had ST's information. Sandberg testified that when he was notified he was being terminated, he copied his e-mails from the computer and that he left ST's premises with the computer and refused to return it. Leake testified that some of the e-mails contained ST's "highly sensitive" financial information. Sandberg's and Leake's testimony would have been sufficient to prove ST's cause of action for Sandberg's breach of the confidentiality agreement. Sandberg went on to testify that when he got home with the computer, he copied more files from the computer. Sandberg also testified that the data storage device he later returned to ST had contained its business

information.  He testified he did not turn over the information he had copied until he was ordered to do so by the trial court.

In light of Sandberg's testimony that he did not immediately return the computer after he was terminated, that he downloaded files including his e-mails from the computer, and Leake's testimony that the e-mails contained ST's confidential information, we conclude the admission of Whitfield's testimony did not probably cause the rendition of an improper judgment.  Therefore, any error the trial court may have committed by admitting Whitfield's expert testimony about the computer and data storage devices did not probably cause the rendition of an improper judgment and was not reversible.  *See* TEX. R. APP. P. 44.1(a)(1).

We overrule Sandberg's sixth issue.

### Excluded Evidence

In his seventh issue, Sandberg contends the trial court erred by excluding evidence in support of his affirmative defense of ST's "prior material breach of the contract."  Sandberg also contends the trial court erred by failing to submit his proposed jury question on the affirmative defense of prior breach.

Outside the presence of the jury, Sandberg's attorney made an offer of proof of the evidence.  The evidence was that ST had made improper tax and accounting entries in other countries, ST paid fines for those improper entries, and ST had provided information regarding those improper entries to Sandberg for him to use in

his work on ST's tax and other financial documents in the United States.  The trial court refused to admit the evidence.

To preserve error in the exclusion of evidence, a party must make the following showing:

> (1) attempt during the evidentiary portion of the trial to introduce the evidence;
>
> (2) if an objection is lodged, specify the purpose for which the evidence is offered and give the trial judge reasons why the evidence is admissible;
>
> (3) obtain a ruling from the court; and
>
> (4) if the judge rules the evidence is inadmissible, make a record, through a bill of exceptions, of the precise evidence the party desires admitted.

*Estate of Veale v. Teledyne Indus., Inc.*, 899 S.W.2d 239, 242 (Tex. App.—Houston [14th Dist.] 1995, writ denied) (citations omitted).  The reasons presented to the appellate court for review must coincide with the reasons presented to the trial court for admitting or excluding evidence.  *Langan v. Langan*, No. 14-12-01134-CV, 2014 WL 3051216, at *2 (Tex. App.—Houston [14th Dist.] July 3, 2014, no pet.) (mem. op.).

In the offer of proof, Sandberg's attorney stated the offered evidence "is a fraud-affirmative defense."  The attorney also stated the evidence was relevant to Sandberg's intent, which concerned Sandberg's liability for punitive damages. Sandberg did not tell the trial court that the evidence was relevant to his defense that

ST breached the confidentiality agreement before he did.[4] We conclude Sandberg has not preserved the argument he presents on appeal concerning the trial court's failure to admit the evidence.

Sandberg states in his brief that, without the admission of the evidence in the offer of proof, there was no evidence to support the submission of the proposed jury question on the affirmative defense of prior breach. Because Sandberg did not preserve error from the trial court's exclusion of his evidence, and Sandberg concedes that evidence was necessary to support submission of his proposed jury question, Sandberg cannot show the trial court erred by refusing to submit the jury question. *See Childress Eng'g Servs., Inc. v. DeLeon*, No. 05-16-00429-CV, 2017 WL 5898520, at *2 (Tex. App.—Dallas Nov. 29, 2017, pet. denied) (mem. op.) ("If there is no evidence to support a proposed jury question, the trial court may refuse to submit it.").

We overrule Sandberg's seventh issue.

### JUDGMENT NOTWITHSTANDING THE VERDICT ON MISAPPROPRIATION OF TRADE SECRETS

The jury found that Sandberg did not "misappropriate a trade secret owned by" ST. The final judgment states that ST "moved for entry of judgment

---

[4] Sandberg does not explain how ST's alleged improper tax and accounting practices constituted a breach of the confidentiality agreement.

notwithstanding the verdict" on ST's claim for misappropriation of trade secrets. Neither the judgment nor any other order expressly grants or denies ST's motion.

In his eighth issue, Sandberg contends that if the trial court granted ST's motion for judgment notwithstanding the verdict and awarded ST judgment based on its claim for misappropriation of trade secrets, then the trial court erred because ST did not conclusively prove that claim. ST concedes that the judgment's award of damages is based on the jury's verdict, including the jury's finding that Sandberg breached the confidentiality agreement. Accordingly, we need not address this issue.

## RELIEF AWARDED IN THE JUDGMENT

In his ninth issue, Sandberg argues that if we have sustained any of the first seven issues, then ST is not entitled to the damages, attorney's fees, and injunctive relief awarded in the judgment. Because we have overruled those issues, this argument lacks merit. We overrule Sandberg's ninth issue.

## ATTORNEY'S FEES

Sandberg's tenth, eleventh, twelfth, and fourteenth issues contend the trial court erred by awarding ST its attorney's fees. The jury found ST's attorney's fees through trial were $1,346,658.79. The jury found "the reasonable fee for the necessary services of [ST's] attorneys . . . [f]or representation through appeal to the court of appeals" and before the Supreme Court of Texas was "$0." The trial court awarded ST $1,346,658.79 for attorney's fees through trial as found by the jury. The court disregarded the jury's answers concerning appellate attorney's fees and

–31–

awarded ST $50,000 for representation before the court of appeals, $50,000 if Sandberg files a petition for review before the supreme court, $100,000 for briefing before the supreme court, and $50,000 if the supreme court grants oral argument.

**Presentation of Claim**

In his tenth issue, Sandberg contends that ST is not entitled to attorney's fees under Chapter 38 of the Civil Practices and Remedies Code because ST did not present its claim as required by section 38.002.

Section 38.001(8) provides, "A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for: . . . (8) an oral or written contract." TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8). Section 38.002 provides,

> To recover attorney's fees under this chapter:
>
> (1) the claimant must be represented by an attorney;
>
> (2) the claimant must present the claim to the opposing party or to a duly authorized agent of the opposing party; and
>
> (3) payment for the just amount owed must not have been tendered before the expiration of the 30th day after the claim is presented.

*Id.* § 38.002. Sandberg argues that ST failed to "present the claim to the opposing party or to a duly authorized agent of the opposing party."

To recover attorney's fees in a suit founded on a written contract under section 38.002, a plaintiff must plead and prove that presentment of a contract claim was made to the opposing party and he failed to tender performance. *Jones v. Kelley*,

614 S.W.2d 95, 100 (Tex. 1981); *Helping Hands Home Care, Inc. v. Home Health of Tarrant Cty., Inc.*, 393 S.W.3d 492, 516 (Tex. App.—Dallas 2013, pet. denied). The purpose of the presentment requirement is to allow the person against whom a claim is asserted an opportunity to pay within thirty days of receiving notice of the claim without incurring an obligation for attorney's fees. *Jones*, 614 S.W.2d at 100; *Helping Hands*, 393 S.W.3d at 515. No particular form of presentment is required. *Jones*, 614 S.W.2d at 100; *Helping Hands*, 393 S.W.3d at 516. Presentment may be done orally or in writing. *Jones*, 614 S.W.2d at 100; *Belew v. Rector*, 202 S.W.3d 849, 857 (Tex. App.—Eastland 2006, no pet.). The claim must be for money "or at least something of value." *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 797 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (quoting *ITT Commercial Fin. Corp. v. Riehn*, 796 S.W.2d 248, 256 1990, no writ)). Courts have upheld awards of attorney's fees to employers under Chapter 38 when the employer was granted an injunction but not damages against a former employee for breach of a covenant not to compete. *See Butler*, 51 S.W.3d at 797; *Williams v. Compressor Eng'g Corp.*, 704 S.W.2d 469, 474 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.).

In the original petition, ST sought an injunction against Sandberg requiring him to turn over the computer and any information he copied. Before ST filed suit, ST made known this complaint by Quill's oral demand to Sandberg on December 10, 2015, to hand over the computer before he left ST's premises and his subsequent written demand later that day that Sandberg return the computer immediately. Both

these demands were made before ST filed suit and provided Sandberg the opportunity to comply without incurring an obligation to pay attorney's fees. *See Jones*, 614 S.W.2d at 100; *Helping Hands*, 393 S.W.3d at 515.

Sandberg argues that Quill's statements to Sandberg about returning the computer were merely "discussions" that did not constitute presentment of the claim. We disagree. On December 10, 2011, after Sandberg left with the computer and before ST filed suit, Quill sent Sandberg an e-mail stating:

> ST hereby demands the immediate return of all ST-owned or leased property, including the laptop computer that was provided to you for use in your employment with ST, and any and all information and documents in your possession or under your control, whether in physical or digital format, including any and all copies thereof. You are not to retain any copies of ST property.

This was no mere "discussion." It was a demand for "the immediate return" of the computer and for compliance with the confidentiality agreement.

We conclude the e-mail was sufficient to constitute presentment of the claim under section 38.002. We overrule Sandberg's tenth issue.

### Reasonableness of Attorney's Fees

In his eleventh issue, Sandberg argues the award of attorney's fees in this case was not reasonable because it was sixty-one times the amount of ST's actual damages.

In *Arthur Andersen & Co. v. Perry Equipment Co.*, 945 S.W.2d 812 (Tex. 1997), the Texas Supreme Court listed eight factors that should be considered when

determining whether an attorney's fee is reasonable.[5]  One of those factors is "the amount involved and the results obtained."  *Id.* at 818.  Sandberg does not discuss how the other seven factors apply in this case.  Because Sandberg focused on only one of the eight factors and does not explain how the other seven factors would apply, he has not shown the fee is unreasonable.

In support of his argument, Sandberg cites *Smith v. Patrick W.Y. Tam Trust*, 296 S.W.3d 545 (Tex. 2009).  In that case, the Trust sued Smith for breach of a lease.  *Id.* at 546.  The Trust sought damages of $215,931.50, and attorney's fees through trial of $47,438.75.  The jury awarded the Trust damages of $65,000, about thirty percent of the damages sought, and $0 as attorney's fees.  *Id.*  The trial court rendered judgment notwithstanding the verdict on the attorney's fees and awarded the Trust attorney's fees through trial of $7,500.  We determined that the Trust was entitled to

---

[5] The *Arthur Andersen* factors are:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;
>
> (2) the likelihood . . . that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;
>
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
>
> (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997) (quoting TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.04).

the full amount of attorney's fees it sought, $47,438.75, because it proved that amount as a matter of law. *Smith v. Patrick W.Y. Tam Trust*, 235 S.W.3d 819, 828 (Tex. App.—Dallas 2007) ("Because the Trust presented competent, uncontroverted evidence of its right to attorney's fees and because the Smiths did not challenge the amount, nature, or necessity of these fees, we conclude the trial judge abused his discretion in awarding $7500."), *rev'd*, 296 S.W.3d 545 (Tex. 2009). The supreme court determined that because the jury had awarded the Trust far less damages than the Trust sought, there was a fact question whether $47,438.75 was a reasonable attorney's fee. *Smith*, 296 S.W.3d at 548. The supreme court said, "the fee is unreasonable in light of the amount involved and the results obtained." *Id.* However, that is one of eight factors. The unreasonableness of that one factor meant that the amount of attorney's fees was not established as a matter of law and that the amount had to be determined by a jury. *Id.* The court observed that although the amount the court of appeals awarded was unreasonable under one factor, on retrial, the jury could award a similar amount. *Id.*

This case is distinguishable from *Smith*. Here, it was the jury as finder of fact that determined the reasonable amount of attorney's fees, not the trial court or court of appeals ruling as a matter of law. The fact that one of the *Arthur Andersen* factors does not support the full amount of attorney's fees requested does not mean that the totality of the evidence supporting the other factors does not support that amount.

Because Sandberg does not address the other factors, we cannot conclude that the jury's finding was erroneous.

Sandberg also cites this Court's statement in *Sharifi v. Steen Automotive, LLC*, 370 S.W.3d 126 (Tex. App.—Dallas 2012, no pet.): "attorney's fees should generally bear some reasonable relationship to the amount in controversy." *Id.* at 153. However, as we then went on to explain, "the amount of damages awarded is not the sole determining factor. Further, there is no rule that fees cannot be more than actual damages." *Id.* (citations omitted). Sandberg does not explain why this case cannot be one of those situations where the attorney's fees may greatly exceed the amount of damages.

We overrule Sandberg's eleventh issue.

## Appellate Attorney's Fees

In his twelfth issue, Sandberg contends the trial court erred by awarding appellate attorney's fees when the jury determined the reasonable amount of appellate attorney's fees was $0.

When a party proves its entitlement to recover attorney's fees under section 38.001, an award of some attorney's fees is mandatory. *Gunter v. Bailey*, 808 S.W.2d 163, 166 (Tex. App.—El Paso 1991, no writ). "If trial attorney's fees are mandatory under section 38.001, then appellate attorney's fees are also mandatory when proof of reasonable fees is presented." *Ventling v. Johnson*, 466 S.W.3d 143,

154 (Tex. 2015). The jury had discretion to determine a reasonable amount of attorney's fees for appeal, but the jury did not have discretion to award no fees. *Id.*

When the jury awards no fees, the trial court may award fees if the reasonable amount of the fees is proven as a matter of law. *See Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990). However, when the jury awards $0 and the amount of a reasonable attorney's fees is not established as a matter of law, "[t]he trial court could have directed the jury to reform its verdict, but the court was not free to set a reasonable fee on its own." *Smith*, 296 S.W.3d at 548 (citation omitted).

In this case, ST's attorney testified that the reasonable fees ST would incur before the court of appeals would be $150,000. She also testified that ST's reasonable fees before the Supreme Court of Texas would be $50,000 to prepare a response to a petition for review, $100,000 for substantive briefing, and $50,000 to prepare for and present oral argument, for a total of $200,000 for representing ST before the supreme court.

Sandberg's attorney testified he estimated the charges for his representing Sandberg on appeal would be $50,000 before the court of appeals and $50,000 before the Supreme Court of Texas. He also testified that, even though he is board certified in civil appellate law, he could not imagine charging a client $150,000 for representation before an intermediate court of appeals. He testified, "Those numbers are just mind-boggling to me." Concerning the reasonableness of the attorney's fee

of $200,000 for representation before the supreme court, Sandberg's attorney testified:

> They've [ST] got $200,000 on there, in total. I don't know why someone says that it's reasonable and necessary to spend $50,000 for a Texas Supreme Court oral argument, where, in total, one side is talking for approximately half an hour, the other side talks for about half an hour and then generally you get about a 15-minute rebuttal. Because the Texas Supreme Court is busy. They don't have massive amounts of time to listen to attorneys.

The trial court awarded ST attorney's fees of $50,000 for representation before the court of appeals and up to $200,000 for representation before the Supreme Court of Texas.

Because Sandberg's attorney testified that $50,000 for representation before the court of appeals was a reasonable amount and ST's attorney testified the attorney's fees before the court of appeals would be $150,000, the evidence conclusively establishes that the $50,000 the trial court awarded for representation before the court of appeals is not unreasonably high.[6] However, Sandberg's attorney's testimony constitutes some evidence that ST's fees exceeding $50,000 for representation before the supreme court were not reasonable. Accordingly, the trial court erred by awarding ST fees as a matter of law of more than $50,000 for representation before the supreme court.

---

[6] ST did not appeal the trial court's award of $50,000 for attorney's fees before the court of appeals, so we do not consider whether that amount was unreasonably low.

We sustain the twelfth issue regarding the award of attorney's fees for representation before the supreme court. We overrule the issue regarding the award of attorney's fees for representation before the court of appeals.

**Attorney's Fees as Part of the Permanent Injunction**

In his fourteenth issue, Sandberg contends the trial court erred by ordering that if Sandberg violated the permanent injunction, "ST shall be entitled to recover its reasonable attorneys' fees and costs incurred in obtaining and enforcing this Permanent Injunction." Sandberg argues that no Texas law permits an injunction order to provide for attorney's fees for enforcing the injunction.

Texas courts operate on the settled rule that—absent a contract or statute—trial courts do not have inherent authority to require a losing party to pay the prevailing party's fees. *See Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 310–11 (Tex. 2006). Moreover, we may not infer the authorization of attorney's fees; instead, that authorization must be expressly provided. *Travelers Indem. Co. of Conn. v. Mayfield,* 923 S.W.2d 590, 593 (Tex. 1996); *Shilling v. Gough*, 393 S.W.3d 555, 558 (Tex. App.—Dallas 2013, no pet.).

ST does not cite any statute or contract expressly authorizing an award of attorney's fees for violation of an injunction. Instead, ST states that the trial court has inherent authority to award attorney's fees for violations of injunctions. Whether trial courts have inherent authority to award attorney's fees in appropriate circumstances for a violation of an injunction is not the issue. The issue is whether

the trial court may authorize the award of attorney's fees before any violation of the injunction has occurred. The court's inherent authority to award attorney's fees in the appropriate circumstances, if any, is not dependent on the mention of attorney's fees in the injunction order.

ST also observes that Rule of Civil Procedure 308 permits a trial court to "enforce its judgment by attachment, fine and imprisonment." *See* TEX. R. CIV. P. 308. However, "attachment, fine and imprisonment" are not attorney's fees. As discussed above, we may not infer the authorization of attorney's fees.

We conclude the trial court erred by providing in the order of injunction that ST would be entitled to attorney's fees for enforcing the injunction against Sandberg.[7] We sustain Sandberg's fourteenth issue.[8]

## INJUNCTION

In his thirteenth issue, Sandberg contends the trial court erred by imposing a permanent injunction against him.

---

[7] Courts have awarded attorney's fees to parties enforcing injunctions violated by the opposing party. *See, e.g.*, *Cullum v. White*, 399 S.W.3d 173, 190 (Tex. App.—San Antonio 2011, pet. denied); *Jacobs v. Plummer*, No. 03-07-00097-CV, 2008 WL 5340209, at *1 (Tex. App.—Austin Dec. 23, 2008, no pet.) (mem. op.) (trial court held appellant in contempt of court for violations of temporary injunction and awarded party enforcing injunction attorney's fee of $1,000). This Court has held that attorney's fees are not available under section 21.002(b) of the Government Code for violations of an injunction constituting criminal contempt of court. *In re Daugherty*, No. 05-18-00290-CV, 2018 WL 3031658, at * 1, 5 (Tex. App.—Dallas June 19, 2018, orig. proceeding) (mem. op.) ("Absent a contractual or statutory basis, a trial court lacks authority to award attorneys' fees based on a finding of contempt."); *see also* TEX. GOV'T CODE § 21.002(b).

[8] We express no opinion whether the trial court has the authority to award ST reasonable and necessary attorney's fees as appropriate should Sandberg violate the injunction.

–41–

"A successful applicant for injunctive relief must demonstrate the following four grounds for relief: 1) the existence of a wrongful act; 2) the existence of imminent harm; 3) the existence of irreparable injury; and 4) the absence of an adequate remedy at law." *Priest v. Tex. Animal Health Comm'n*, 780 S.W.2d 874, 875 (Tex. App.—Dallas 1989, no writ). "The grant or refusal of a permanent or temporary injunction is ordinarily within the sound discretion of the trial court and, on appeal, review of the trial court's action is limited to the question of whether the action constituted a clear abuse of discretion." *Id.* A court abuses its discretion if it acts "without reference to any guiding rules and principles" or if "the act was arbitrary or unreasonable." *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

Sandberg asserts ST failed to prove the existence of imminent harm, an irreparable injury, and the absence of an adequate remedy at law. These last two elements are directly related. As the Houston (14th District) Court of Appeals observed, "When the term 'irreparable injury' is used with 'no adequate remedy at law' the former term is a misnomer, because if an injury is irreparable, there is no remedy for it, adequate or inadequate." *Williams*, 704 S.W.2d at 472.

Sandberg admitted to copying files from the laptop, including his e-mails. ST presented evidence that those e-mails contained ST's confidential information. Sandberg turned over to ST data storage devices on which he had copied files from the computer. However, Whitfield testified "that there was a high likelihood that in

addition to the device which had been turned over to us for analysis, that other devices may still contain STMicro data as they were certainly used to facilitate the copying and deletion and formatting of those devices." He testified that it was "more likely than not that Mr. Sandberg could still today access files relating to ST's business." Quill testified that "Mr. Sandberg broke the promise not to use or disclose company information . . . ." The evidence also shows that some of the e-mails ended up on the desktop computer of Sandberg's attorney. The trial court could conclude from this evidence that Sandberg had used or disclosed ST's confidential information. Because the evidence showed Sandberg likely retained ST's confidential information and had used or disclosed it, the trial court could find that ST was facing imminent harm, had suffered an irreparable injury, and had no adequate remedy at law. *Cf. Orbison v. Ma-Tex Rope Co.*, 553 S.W.3d 17, 33 (Tex. App.—Texarkana 2018, pet. denied) (trial court did not abuse discretion by enjoining employee who had used and disclosed employer's confidential information after leaving employer).

We conclude Sandberg has not shown the trial court abused its discretion by permanently enjoining him. We overrule Sandberg's thirteenth issue.

## SEALING OF THE RECORD

In his fifteenth issue, Sandberg contends the trial court erred by signing orders sealing the record in this case. In his opening brief, Sandberg asserted that four orders sealing the record were erroneous. In its appellee's brief, ST argued that

–43–

Sandberg did not timely appeal these orders. In his reply brief, Sandberg concedes that the appeal of three of the orders was untimely but that he timely appealed the April 10, 2017 order. Accordingly, we address only the order signed by the trial court on April 10, 2017.

In this issue, Sandberg argues that the sealing orders lack specificity, do not meet the standard for sealing, and the hearing notices failed to provide a specific description of the information to be sealed. *See* TEX. R. CIV. P. 76a. The April 10, 2017 order is not a sealing order. It is an order to substitute an unredacted letter from Sandberg's attorney that was attached to the declaration of one of ST's attorneys with a redacted version of that letter. The declaration to which the letter was attached was one of the documents subject to a sealing order that Sandberg did not timely appeal. Sandberg's arguments on appeal do not appear to apply to the April 10, 2017 order. Sandberg does not explain why the trial court's order substituting the redacted letter for the unredacted letter was an abuse of discretion.

We overrule Sandberg's fifteenth issue.

## COSTS BILL

In his sixteenth issue, Sandberg contends the trial court erred by failing to enter an order on Sandberg's motion to correct ST's costs bill. Sandberg asserts that ST's costs bill included expenditures that are not properly costs.

After the trial court signed the final judgment, Sandberg filed his motion to retax costs. At the hearing, the trial court stated, "I will sign" an order changing the costs awarded. However, the trial court did not sign such an order.

To preserve error for appellate review from the trial court's failure to grant a motion, a party must obtain a ruling from the trial court on the motion or object to the trial court's refusal to rule on the motion. TEX. R. APP. P. 33.1(a)(2). In this case, the trial court did not rule in writing on Sandberg's motion to retax costs. Sandberg argues that postjudgment motions, such as his motion to retax costs, are preserved without the necessity of a ruling by the trial court. The Rules of Civil Procedure provide that certain motions are deemed denied or overruled without a specific ruling by the trial court. *See, e.g.*, TEX. R. CIV. P. 165a(3) (motion to reinstate case following dismissal for want of prosecution overruled by operation of law seventy-five days after judgment); *id.* 329b(c) (motion for new trial overruled by operation of law seventy-five days after judgment); CIV. PRAC. § 27.008(a) (motion to dismiss under Texas Citizens Participation Act denied by operation of law thirty days after the hearing on the motion to dismiss). Sandberg does not point to any rule of procedure that indicates a motion to retax costs is such a motion. We conclude Sandberg has not preserved his contention for appellate review.

We overrule Sandberg's sixteenth issue.

## CONCLUSION

We modify the trial court's judgment to remove the provision in the injunction stating that ST shall be entitled to recover its reasonable attorneys' fees incurred in obtaining and enforcing the permanent injunction. We reverse the trial court's judgment to the extent it awards ST attorney's fees for appeal to the Supreme Court of Texas, and we remand the case to the trial court for further proceedings consistent with this opinion. In all other respects, we affirm the trial court's judgment.

/Lana Myers/
LANA MYERS
JUSTICE

181360F.P05



## Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

JEROME SANDBERG, Appellant

No. 05-18-01360-CV     V.

STMICROELECTRONICS, INC., Appellee

On Appeal from the 298th Judicial District Court, Dallas County, Texas Trial Court Cause No. DC-15-14938. Opinion delivered by Justice Myers. Justices Carlyle and Evans participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part, **REVERSED** in part, and **MODIFIED** in part as follows:

The judgment of the trial court is **REVERSED** insofar as it awards appellee STMicroelectronics, Inc. attorneys' fees for representation before the Supreme Court of Texas, and the cause is **REMANDED** to the trial court for further proceedings consistent with this opinion.

The judgment of the trial court is **MODIFIED** to **DELETE** the provision in the Permanent Injunction providing that appellee STMicroelectronics, Inc. shall be entitled to recover its reasonable attorney's fees incurred in obtaining and enforcing the Permanent Injunction.

In all other respects, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee STMicroelectronics, Inc. recover its costs of this appeal from appellant Jerome Sandberg.

Judgment entered this 9th day of April, 2020.